FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **E.P.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION NO.:** |
| **vs.** | : | |
| | : | **4:24-cv-00216** |
| **G6 HOSPITALITY, LLC;** | : | |
| **G6 HOSPITALITY** | : | |
| **PROPERTY LLC;** | : | |
| **MOTEL 6 OPERATING L.P.** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF E.P.'S RESPONSE IN OPPOSITION TO G6 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE MERITS**

FILED UNDER SEAL

**TABLE OF CONTENTS**

**INTRODUCTION** ........ 1
**STATEMENT OF MATERIAL FACTS** ........ 1
**I. Tucker Motel 6's Ownership, Management, & Performance.** ........ 2
**II. Tucker Motel 6's Rampant Crime, and "Problem" with Commercial Sex Crimes.** ........ 2
**III. Tucker Motel 6's Policies and Practices Facilitated Commercial Sex Crimes.** ........ 4
**IV. Sex Trafficking of 15-year-old E.P. at Tucker Motel 6 in 2014.** ........ 7
a. E.P. was sex trafficked at Tucker Motel 6 from at least February 2014 –April 2014. ........ 7
b. Police Visit Tucker Motel 6 with a Flyer about E.P., a Missing Child. ........ 10
c. E.P.'s Interactions with Tucker Motel 6 staff. ........ 10
d. Corroboration of E.P.'s account by witnesses and records. ........ 11
**STATEMENT OF THE ISSUES** ........ 12
**LEGAL STANDARD** ........ 13
**ARGUMENT** ........ 13
**I. E.P.'s allegations are detailed and corroborated by extensive evidence.** ........ 13
a. E.P.'s testimony is detailed and extensively corroborated. ........ 14
b. Defendants' argument based on *Scott* and its progeny ignores circuit authority and the record. ........ 17
**II. E.P. has produced extensive evidence supporting each element of her beneficiary claim under 18 U.S.C. § 1595(a).** ........ 21
a. There are disputed material facts as to whether Defendants knowingly benefited. ........ 21
b. There are disputed material facts as to whether Defendants participated in a venture. ........ 22
c. There are disputed material facts as to whether the venture engaged in an act in violation of the TVPRA. ........ 26
d. There are disputed material facts as to Defendants' actual or constructive knowledge. ........ 27
**III. E.P.'s Texas state law claim succeeds.** ........ 29
**CONCLUSION** ........ 30

FILED UNDER SEAL

# TABLE OF AUTHORITIES

## Cases

*A.G. v. Northbrook Indus., Inc.*, 171 F.4th 1257 (11th Cir. 2026) ........ 23
*A.G. v. Northbrook Indus., Inc.*, 171 F.4th 1257, 1270 (11th Cir. 2026) ........ 12
*Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021) ........ 18
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ........ 13
*C.R. Pittman Const. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 Fed. Appx. 439, 443 (5th Cir. 2011) ........ 20
*Castro v. United States*, 140 S. Ct. 874, 205 L. Ed. 2d 499 (2020) ........ 29
*Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 730 (5th Cir. 2018) ........ 18
*Doe #1 v. Red Roof Inns*, 21 F.4th 714, 723 (11th Cir. 2021) ........ 21
*Doe (E.M.B.) v. G6 Hosp., LLC*, No. 9:23-CV-00173-MJT-CLS ........ 22
*Doe (K.E.C.) v. G6 Hosp., LLC*, 750 F. Supp. 3d 719, 730-731 (E.D. Tex. 2024) ........ 23
*Doe (T.D.B.) v. G6 Hosp., LLC*, No. 9:23-CV-00174, 2026 WL 1008529, at *3 (E.D. Tex. Apr. 6, 2026) ........ 21
*G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023) ........ 21
*G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 558 (7th Cir. 2023) ........ 13
*Henderson v. T&M Boat Rentals, LLC*, CV 17-2042, 2018 WL 3819930, at *5 (E.D. La. Aug. 10, 2018) ........ 21
*Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) ........ 16
*K. S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x 780, 784 (5th Cir. 2017) ........ 17
*Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) ........ 18
*Liberty Ins. Corp. v. Dixie Elec., L.L.C.*, 637 F. App'x 113, 116 (5th Cir. 2015) ........ 13
*M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Ohio 2019) ........ 16
*Mata v. S. San Antonio Indep. Sch. Dist.*, 7 F.3d 230, 230 (5th Cir. 1993) ........ 17
*Pigott v. Gintz*, 23-30879, 2024 WL 5087911, at *5 (5th Cir. Dec. 12, 2024) ........ 18
*S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147 (E.D.N.Y. 2020) ........ 16
*S.W. v. Tropical Paradise Resorts, LLC*, 25-CV-60771, 2026 WL 806786, at *6 (S.D. Fla. Mar. 24, 2026) ........ 21
*Tolan v. Cotton*, 572 U.S. 650, 657 (2014) ........ 13
*United States v. Whyte*, 928 F.3d 1317, 1329–30 (11th Cir. 2019) ........ 29
*Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472 (5th Cir. 2019) ........ 17

## Statutes

§ 1591 ........ 23
§ 1591(a) ........ 28
§ 1591(c) ........ 29
§ 1595(a) ........ 16, 27
§ 20A.02(a) ........ 30
18 U.S.C. § 1591 ........ 25
18 U.S.C. § 1591(a) ........ 27
18 U.S.C. § 1591(c) ........ 29

**18 U.S.C. § 1595(a)** ........ 21, 26
18 U.S.C. 1595(c)(2) ........ 14
Tex. Civ. Prac. & Rem. Code Ann. § 16.0045(a)(4) ........ 14, 29

**Rules**

Fed. R. Civ. P. 56(a) ........ 13
Rule 56 ........ 3, 13, 14, 23

FILED UNDER SEAL

## INTRODUCTION

In 2014, when E.P. was a freshman in high school, she was sex trafficked for months at Tucker Motel 6, a hotel that Defendants solely owned and operated.

Tucker Motel 6 was the perfect place for traffickers to sell the 15-year-old to scores of sex buyers. Defendants' General Manager for Tucker Motel 6 admitted that the hotel had a "problem" with prolific commercial sex crimes and "a lot" of traffic "in and out" of rooms. She "couldn't put a number" on how many women and girls were sold for sex there, but "know[s]" that she saw "quite a bit." Commercial sex crimes flourished at Tucker Motel 6 because it did not have enough security and staff routinely broke basic safety rules. When Defendants refused their G.M.'s repeated requests for more security, the G.M. wanted the hotel "shut down." But Defendants continued operating it and profiting from it. Defendants gave E.P. room keys without ID "almost daily," accepted cash directly from E.P. to extend a room rental without ID, continuously rented rooms to her traffickers and helped them switch rooms, and worse, served as lookouts for them.

Remarkably, Defendants' summary-judgment motion never mentions their G.M.'s admissions. Nor the contemporaneous records and eyewitnesses corroborating E.P.'s account. Nor the eight witnesses—including police officers, sex trafficking survivors, and hotel employees—who attest that commercial sex crimes flourished there because staff routinely broke security rules and facilitated the criminal enterprises operating on the property. Instead, Defendants isolate slivers of the record and construe them against E.P. That is not the Rule 56 standard. When the proper summary-judgment standard is applied, Defendants' motion must be denied.

## STATEMENT OF MATERIAL FACTS

Defendants' "Statement of Undisputed Facts" construes fragments of the record in the light most harmful to E.P. As demonstrated below, there are material disputed facts warranting a jury trial on E.P.'s claims.

## I. Tucker Motel 6's Ownership, Management, & Performance.

At all relevant times, Defendants directly owned (and did not franchise) the Motel 6 located at 2810 Lawrenceville Highway, Tucker, GA 30084 ("Tucker Motel 6"). Ex. 3 at 16:6-10 (Walker 30(b)(6) Dep.). Defendants admit that they had *sole* responsibility for managing, operating, and securing Tucker Motel 6 during the relevant period. *Id.* at 16:11-17:19. Defendants earned revenue from the hotel's operation. Ex. 4 at 47:19-49:1, 56:6-57:3, 16:7-11, 20:2-22:1, 50:22-51:1 (Ping 30(b)(6) Dep.)

During the relevant period, Defendants employed all the staff for Tucker Motel 6, including G.M. Veena Primm. Ex. 2 at 10:21-11:4, 30:15-21 (Primm Dep.); Ex. 4 at 57:6-15. During G.M. Primm's tenure, Tucker Motel 6 was highly profitable. Ex. 2 at 33:12-16. On an "average night," there were "hundreds of people staying at the hotel." *Id.* at 64:8-11. The hotel consistently surpassed Defendants' occupancy goals because "occupancy was always high." *Id.* at 24:12-13. The hotel's financial results were "terrific." *Id.* at 138:23-25.

The hotel's reviews, however, "weren't good." *Id.* at 117:17-25, 138:23-139:24; Ex. 5 at 85:10-15 (Martin Dep.). The "environment" at the hotel "was really rough" and "intense." Ex. 2 at 13:2, 142:23. There were "always negative reviews" about "traffic," namely "people walking around or lingering." *Id.* at 117:22-118:3; Ex. 5 at 19:16 ("a lot of foot traffic on the property").

## II. Tucker Motel 6's Rampant Crime, and "Problem" with Commercial Sex Crimes.

Defendants admit through their own G.M. that crime was "common," "frequent," and "persistent" at Tucker Motel 6. Ex. 2 at 17:9-14; Ex. 5 at 113:15-114:1 ("very high crime area").

Their G.M. admitted that Tucker Motel 6 had a "problem" specifically with commercial sex crimes. Ex. 2 at 91:16-20, 17:15-25. G.M. Primm "couldn't put a number" on how many women (over 18) and girls (under 18) were sold for sex at Tucker Motel 6, but she "know[s]" that

she "s[aw] quite a bit." *Id.* at 17:15-25. The hotel's cameras showed "a lot of [men] in and out, in and out, in and out, in and out" of rooms. *Id.* at 86:15-87:3, 142:24-25 ("constantly see guys exchanging things in hands or people going in and out of rooms"); Ex. 5 at 100:13-15 ("we talked about heavy traffic to rooms, there was a lot of that"). Tucker Motel 6 was "busy" with commercial sex crimes. Ex. 2 at 86:15-17. Defendants' G.M. admitted that Defendants knew (because she knew) that commercial sex crimes occurred at Tucker Motel 6 during "all times of day," on "all parts of the property," and in "multiple rooms on the property." *Id.* at 87:4-11.

The commercial sex market was so entrenched at Tucker Motel 6 that sex workers came to G.M. Primm to see if she could help them get paid for their work. *Id.* at 91:18-92:10 ("If you're out there selling yourself, I can't help you collect your money.") G.M. Primm "noticed pimps" because they would talk to her about the girls and women they had on the property. *Id.* at 88:17-23. One trafficker at the property even solicited G.M. Primm's daughter. *Id.* at 15:3-11. Because of that, and because she "didn't feel safe" at Tucker Motel 6, G.M. Primm moved out of the hotel, even though she was *required* to live there. *Id.* at 18:4-13; Ex. 3 at 181:3-25, 184:11-13.

At least eight witnesses, including E.P., have confirmed that commercial sex crimes were prolific at Tucker Motel 6.[1] So have contemporaneous records. Ex. 17 at EP-000006, 10 (DeKalb County analysis showing crimes at Tucker Motel 6 from 2010 – 2014); Ex. 18 (6/6/2014 email re "teenage prostitution" at Tucker Motel 6).

[1] *See* Ex. 2 (G.M.'s deposition); Ex. 6 (E.P.'s deposition); Ex. 7 at 96:6-16, 83:16-23 (A.M. Dep.); Exs. 8-12 (declarations from five survivors who engaged in commercial sex acts at the hotel, including A.M.); Exs. 13-15 (declarations from three Vice Unit Officers); Ex. 16 (declaration from former hotel staff). Defendants have moved to strike the officers' eye-witness testimony as improper and belated expert testimony. E.P. has responded. At the Rule 56 stage, the testimony of *any* of these eight witnesses is enough. For example, the G.M.'s testimony alone is enough. Together, the testimony of these eight witnesses (who are the tip of the iceberg) is overwhelming.

## III. Tucker Motel 6's Policies and Practices Facilitated Commercial Sex Crimes.

Commercial sex crimes boomed at Tucker Motel 6 year after year (Ex. 2 at 21:5-10) because of Defendants' inadequate security given the overwhelming crime, staff members who did not follow security rules, and staff members who were complicit in the criminal enterprises.

***Inadequate security for overwhelming crime.*** The "first time" that G.M. Primm's supervisor visited Tucker Motel 6, he saw that "security was a problem[.]" Ex. 5 at 107:15-17.[2] G.M. Primm was responsible for overseeing security at Tucker Motel 6, and she believed there was "absolutely not" enough physical security there.[3] Ex. 2 at 62:21; Ex. 3 at 97:2-7 (G.M. had "primary responsibility" for security), 180:4-10 (G.M. "in charge of the safety and security"). Tucker Motel 6 was "huge," and G.M. Primm thought it needed a daytime officer, and "more than one" officer at night. Ex. 2 at 102:16-21; 21:5-22:8.

G.M. Primm repeatedly asked Defendants for more physical security at Tucker Motel 6 "throughout" her "tenure," including in 2014. *Id.* at 211:14-18, 127:10-18; Ex. 3 at 79:9-10 (corporate approval required), 82:23-83:1. Defendants refused to authorize it. Ex. 2 at 21:15-17, 110:19-24; Ex. 3 at 85:10-14, 88:20-25, 92:12-93:18, 99:11-21; Ex. 5 at 118:1-18. At the same

---

[2] G.M. Primm's supervisor was directly employed by Defendants, too. Ex. 5 at 9:14-23. He supervised G.M. Primm from around 2010 to May 2013. *Id.* at 12:7-20.

[3] In 2014, Tucker Motel 6 had 24 hours per week of coverage from an off-duty DeKalb County Police Department officer. Ex. 3 at 121:19-122:4. In practice, one off-duty officer worked, alone, on certain nights of the week at Tucker Motel 6 for limited hours, Ex. 2 at 14:14, 21:15-16, and the total hours worked per week was 24. Ex. 3 at 121:19-122:4. There was no off-duty officer during the day at Tucker Motel 6. Ex. 2 at 21:12-17. The property also had 22 security cameras (Ex. 2 at 105:20) monitored by an off-site company that purportedly would "call down" from the cameras if there were suspicious activity on the property. Ex. 19B at 23:12-24:9 (Windes Dep. Vol. 2). But the cameras were not effective in monitoring criminal activity, *id.* at 27:23-28:24, and Defendants do not know how often the off-site company was monitoring the property or "calling down," (Ex. 3 at 52:16-53:16), or how many properties the company was monitoring at once, *id.* at 53:17-23.

time, Defendants directed G.M. Primm to be the "eyes and ears" and to "always be watching" for criminal activity at the hotel. Ex. 5 at 41:17-23; Ex. 19A 48:20-49:2 (Windes. Dep. Vol. 1).[4]

Without the security needed to address "the extensive crime," G.M. Primm and her team "couldn't monitor everything going on there." Ex. 2 at 23:22-24:7. The "security challenges" "got to be overwhelming." *Id.* at 143:19-22, 142:5-11 ("couldn't battle it all"), 142:15-19 ("it got to be a burden because there was no backup"), 34:11-16 ("so much stuff just slipped by" "you just can't stay on top of" it). It was so out of control that G.M. Primm believed Tucker Motel 6 should be "shut down." *Id.* at 23:22-24:7.

***Staff members who did not follow security rules.*** Making matters worse, Defendants' staff at Tucker Motel 6 did not follow security rules.

Defendants' "security rule[s]" required front desk staff to check IDs *before* renting rooms, *before* extending room reservations, and *before* giving out room keys. Ex. 3 at 127:25-128:9, 134:13-17, 135:6-12; Ex. 20 at 75:4-76:3 (Zottl Dep.). "[G]iving out room keys without checking IDs" "absolutely" creates "potential security risks." Ex. 3 at 136:23-137:3.[5] Defendants' own policy admonished: "[n]ever give a key to anyone but a registered guest with identification." *Id.* at 134:2-12.

At Tucker Motel 6, these basic security rules were admittedly and routinely violated. At the initial check-in stage, Tucker Motel 6 staff regularly failed to record ID information and guests

[4] Defendants' contention that E.P. "did not claim that motel staff would have observed th[e] 'heavy foot traffic'" to her room (Mot. at 29) is wrong. As shown, Defendants directed their G.M. and her team to "always be watching," the G.M. repeatedly saw traffic "in and out" of rooms on the hotel cameras, and she talked to her supervisor about the traffic regularly. More, foot traffic to a room is "the biggest" sign of commercial sex activity. Ex. 5 at 47:24-48:2, 30:6-21; Ex. 3 at 173:15-20, 63:21-22.

[5] Defendants' 30(b)(6) representative testified that ID may not need to be checked if "you [] know the person." Ex. 3 at 136:23-137:3. Defendants have claimed that E.P. is lying (Mot. at 14-16) about being trafficked at Tucker Motel 6 and that they did not know her.

in Defendants' electronic check-in system. Ex. 2 at 73:13-74:3. It was a "common issue" that "there would be people staying at the hotel whose names are not in the registration documents." *Id.* at 74:18-24, 64:2-7 ("always" "more people in a room" than registered in system). Defendants used an electronic check-in system that permitted these security violations—it did not require ID information to be entered at the time of check-in. *Id.* at 84:6-8.

These pervasive violations of security rules continued when people came to the front desk to extend room reservations and to get new room keys. In both contexts, there were "issue[s]" with staff failing to check IDs. *Id.* at 79:22-80:13.[6]

Because G.M. Primm violated Defendants' policy requiring the G.M. to live on-site, Tucker Motel 6 lacked the "24-hour" "oversight and responsibility" it needed and that Defendants' own policies required. Ex. 3 at 181:19-21.

***Staff members complicit in commercial sex enterprises.*** Also absent from Defendants' motion is the fact that at least some of Defendants' staff were complicit in the booming commercial sex enterprises. "[S]o much stuff just slipped by" the "front desk staff," and they would just "half report stuff." Ex. 2 at 34:14-23. Some of Defendants' employees would accept drugs or cash from traffickers in exchange for acting as lookouts and sending prospective buyers to the rooms of girls and women being sold for sex. Ex. 7 at 98:1-5, 84:21-24; Ex. 9 at ¶ 9-10 (M.S. Dec.); Ex. 12 at ¶ 9 (J.T. Dec.). Some had sex with the girls. *Id.* at ¶ 4.[7]

---

[6] A Vice Unit officer testified to his personal knowledge of girls and women staying in rooms that they were not registered to, and staying in rooms with no ID associated. Ex. 21 at 81:25-84:3 (Bess Dep.). A former front-desk clerk who worked under G.M. Primm attested that the staff routinely did not check IDs when checking-in guests because the electronic check-in system did not require it, and G.M. Primm approved it. Ex. 16 at ¶ 12 (A. Jones. Dec.). Setting aside these witnesses, Defendants' G.M. admitted that staff routinely did not check or record ID information.

[7] Defendants argue that their security policies and expenditures were robust. Mot. at 9. But written policies were not effective at Tucker Motel 6 because Defendants did not authorize additional off-

FILED UNDER SEAL

## IV. Sex Trafficking of 15-year-old E.P. at Tucker Motel 6 in 2014.

E.P., born in September 1998, is from Georgia. Ex. 6 at 15:3-4, 51:25-52:8. Shortly after eighth grade, E.P. began running away from home. *Id.* at 78:22-79:6, 85:19-23. She typically ran away to an apartment rented by an older friend, Deshaun, who had extra space. *Id.* at 85:21-23, 143:17-21, 86:11-15.

a. E.P. was sex trafficked at Tucker Motel 6 from at least February 2014 –April 2014.[8]

On January 17, 2014, E.P. was 15 years old, and she ran away to Deshaun's apartment.[9] Ex. 6 at 85:21-23, 91:17-19. She stayed until approximately February 10, 2014. *Id.* at 127:9-12. She had "nowhere to go," so she went "across the hall" to an apartment rented by a man named Tight, who she had met through Deshaun. *Id.* at 127:3-8,151:23-152:3. When E.P. asked Tight for help, he "offered to introduce" her to "Angel, who was staying right up the street at the [Tucker] Motel 6." *Id.* at 126:22-127:8. He did. *Id.*

Angel, a "grown woman," rented a room at Tucker Motel 6 and offered E.P. a place to stay. *Id.* at 161:2-4, 127:25. Angel had sex for money at Tucker Motel 6. *Id.* at 136:21-23. In exchange for giving E.P. a room, Angel made E.P. pay for it. *Id.* at 171:13-18. Angel gave E.P. drugs, which E.P. used regularly, *id.* at 92:23-93:4, 93:22-94:5, 94:16-95:1; Ex. 25 at ⁋11 (E.P. Dec.), and Angel provided E.P. with "skimpy, scandalous clothes" that were "[s]hort, too tight, lots of cleavage out," Ex. 6 at 169:8-15. The 15-year-old was then openly advertised for sex—she "stood in [the]

---

duty officers needed to monitor and secure the property, Defendants' staff disregarded security rules, and Defendants' staff facilitated criminal enterprises

[8] E.P. alleged in her First Amended Complaint that she was trafficked at Tucker Motel 6 from "approximately January – March 2014." Doc. 62. During discovery, contemporaneous records received from third parties refreshed her recollection on dates.

[9] E.P.'s mother filed a missing child report, which reports that E.P. ran away on January 17, 2014. Ex. 22 (missing child report).

doorway" of Angel's room and in hallways at Tucker Motel 6 to attract the many men at the hotel interested in buying young girls for sex. *Id.* at 204:9-19; Ex. 25 at ⁋9. And that open display of illegal commercial sex is what "most of the girls did" at Tucker Motel 6. Ex. 6 at 204:13-19. E.P. was sold for sex to "at least five men a day" at Tucker Motel 6 to make the money she paid to Angel. *Id.* at 204:15-17; Ex. 25 at ⁋10 ("A lot of days there were more than 10 buyers").

In total, Angel trafficked E.P. from around February 10, 2014 (*i.e.*, when E.P. was brought to Tucker Motel 6 to meet Angel) until approximately March 30 or 31, 2014. Ex. 6 at 129:1-11. Every day that she was with Angel, E.P. was sold for sex to adult men at Tucker Motel 6. *Id.* at 159:24-25, 126:19-127:17.

On March 31, 2014, E.P.'s circumstances at Tucker Motel 6 changed. From around March 16, 2014 to March 31, 2014—when E.P. was living at Tucker Motel 6 with Angel—a 32-year-old man named Chandan Price picked up E.P. on multiple occasions and took her away from the hotel for "a couple hours." *Id.* at 178:21-179:8, 160:1-10, 122:22-23.[10] One such visit occurred on March 31, 2014. *Id.* at 122:22-23. When Chandan brought E.P. back to the hotel that day, she "could not find" Angel. *Id.* at 129:6-8, 122:23-24. "So that's when [Chandan] convinced me to let him get the room for me." *Id.* at 122:24-25.

As Defendants' own room records show, Chandan Price rented a room at Tucker Motel 6 from March 31, 2014 – April 3, 2014. Exs. 24A and B (room record); Ex. 4 at 77:11-16. During that time, he trafficked the 15-year-old E.P. at Tucker Motel 6. Ex. 6 at 125:10-15, 122:25-126:1.

---

[10] E.P. had previously met Chandan at another location after she ran away from home. Ex.6 at 122:9-12, 123:20-24.

After April 3, he continued to traffic E.P. for weeks at Tucker Motel 6 under a different name. *Id.* at 161:1, 161:14-24.[11] [12]

Chandan worked with another trafficker, Black, at Tucker Motel 6 to traffic E.P. Ex. 6 at 122:4-5; Ex. 25 at ⁋14. Chandan paid Black for use of a room at Tucker Motel 6 so that they could sell E.P. to adults for sex. Ex. 6 at 122:4-5. Chandan talked to Black in hotel common areas while E.P. talked to A.M., a woman trafficked by Black at Tucker Motel 6. Ex. 25 at ⁋14. Chandan's permissiveness in E.P.'s dealings with A.M. was unusual, because "it would make Chandan mad" if E.P. were too friendly with other people. Ex. 6 at 172:9-12, 174:19-23. Several times, A.M. had sex with buyers at Tucker Motel 6 so that E.P. did not have to. Ex. 7 at 65:1-7. At one point, Black called to warn Chandan of police activity on the property. Ex. 6 at 175:9-10. Tucker Motel 6 staff served as lookouts for Black and sent sex buyers to him to facilitate his sex trafficking business at Tucker Motel 6. Ex. 7 at 98:1-5; 84:21-85:7, 93:3-17; 91:14-92:5, 94:9-95:15.

Chandan and E.P. were "always together" at Tucker Motel 6, including in common areas. Ex. 7 at 58:23, 59:1; Ex. 6 at 176:5-9; Ex. 25 at ⁋⁋12-13. They walked together around the property and loitered in common areas together. *Id.* Chandan gave E.P. marijuana, cocaine, and ecstasy. Ex. 6 at 92:23-93:4, 93:22-95:1. He "provided" and "bought" provocative clothes for E.P. *Id*. at 169:8-13. Like with Angel, E.P. attracted sex buyers by loitering in the doorway and in common areas,

---

[11] In her deposition, Defendants asked E.P., "why [Chandan] checked in with his name on March 31st of 2014," and E.P. answered, in part, "[m]aybe because it was a last-minute thing and he didn't expect to do it. Because like I said, we came back to the hotel and Angel was just gone." Ex. 6 at 161:25-162:5. With staff "issues" checking and recording ID, and an electronic system that did not require ID information to be recorded, Chandan could readily check in under another name or through another person. Indeed, there is evidence that he did. *Id.* at 122:4-5, 160:24-161:24.

[12] Both Chandan and Angel switched rooms at Tucker Motel 6 multiple times, and they went to the front desk to do so. Ex. 25 at ⁋⁋5-6.

*id.* at 204:12-18, Ex. 25 at ⁋9, and she saw "at least five men a day" at Tucker Motel 6, Ex. 6 at 204:15-17, Ex. 25 at ⁋10. Chandan took the money. Ex. 6 at 171:13-24.

At some point, in approximately late April or early May 2014, Chandan took E.P. to Orlando, Florida, where he trafficked her in multiple hotels. Ex. 6 at 180:14-20, 183:12-15. On June 3, 2014, the Orlando Police Department recovered E.P. Ex. 23.

Tucker Motel 6 "was the first hotel that [E.P.] was trafficked at[,]" and "[i]t is very significant to [E.P.] and [her] trauma because of that." Ex. 6 at 118:15-17.[13]

b. Police Visit Tucker Motel 6 with a Flyer about E.P., a Missing Child.

After E.P. ran away on January 17, 2014, her mother reported her as a missing child and signed an affidavit submitted to the Juvenile Court of Gwinnett County. Ex. 22. The Gwinnett County Juvenile Court issued a warrant "to take into custody said child." *Id.*

During the time that E.P. was trafficked at Tucker Motel 6, the police "came around the hotel with her picture." Ex. 7 at 62:13-64:18, 66:25-67:16. The notice stated that E.P. was a "missing child or runaway or something like that." *Id.* at 75:11-17. The police went into the Tucker Motel 6 office with the same notice. *Id.* at 70:21-24, 74:12-14. After the police came to Tucker Motel 6, E.P. and Chandan learned of the visit. Ex. 25 at ⁋17. Even so, Chandan continued to traffic E.P. there after the police visit, and he did not change his or E.P.'s activities there. *Id.*

c. E.P.'s Interactions with Tucker Motel 6 staff.

On an "almost daily basis," E.P. went to the front desk to get new key cards. Ex. 6 at 163:16-21. She made these "almost daily" front-desk visits the "whole time" that she was at Tucker

[13] G.M. Primm claimed not to recognize E.P. and expressed surprise that a young White girl was trafficked at the hotel because most of the exploited children were Black. A.M. is White, too. Regardless, G.M. Primm lived off property in 2014, and was "distracted" and not regularly available because her husband was hospitalized. Ex. 5 at 110:14; Ex. 2 at 140:23-141:1.

Motel 6, which was at least February 2014 – April 2014. *Id*. at 163:19-25. "[A]ll they really would ask me is the room number. And they would give me a key card to it." *Id*. at 163:3-5. They did not ask the 15-year-old for her ID. *Id.* at 162:6-24; Ex. 25 at ¶¶ 2-4. E.P. was then trafficked in the rooms. Ex. 6 at 204:11-19.

When she was trafficked by Chandan, E.P. went to the front desk to extend a room rental under Chandan's name for another night. Ex. 6 at 162:15-24. "[W]hen it was time to pay for the hotel that day, he wasn't there and he asked me to go down there." *Id.* at 162:15-17. Chandan instructed E.P. to "tell them your boyfriend is at work and that, you know, you're not going to have anywhere to go, and he won't be off until like 12:00 tonight." *Id.* at 162:18-21. "They never asked me for ID. They never verified how old I was. They just let me pay for the room and continued it in his name." *Id.* at 162:22-24.

To attract sex buyers, E.P. stood in common areas scantily clad. *Id.* at 169:8-13; Ex. 25 at ¶¶9-10. She "exchanged towels out multiple times a day" with housekeeping. Ex. 6 at 167:4-5. "Each time" a "man came" to buy sex from E.P. at Tucker Motel 6, "I would leave him in the room, walk downstairs, get the condom [from Tucker Motel 6's vending machine], go back upstairs. And I did that multiple times a day." *Id.* at 171:11-172:6.

d. Corroboration of E.P.'s account by witnesses and records.

E.P.'s account of her trafficking at Tucker Motel 6 is corroborated by multiple eyewitnesses (Ex. 7 at 128:8-129:6; Ex. 9 at ¶14; Ex. 25 at ¶7), ***and*** documents (Ex. 22, Ex. 26 (photo taken by E.P. of Chandan Price in Atlanta, Georgia on 3/19/14), Ex. 25 at ¶8, Ex. 24A & B, Ex. 27 (5/2/14 police report from Tucker Motel 6 re A.M.'s and E.P.'s trafficker, Black), Ex. 23 (Records from Gwinnett Co. Juvenile Ct.)). A.M. testified under oath that she talked to and saw E.P. at Tucker Motel 6 numerous times from approximately January 2014 – May 2014. Ex. 7 at

58:4-7, 58:21-23. A.M. also corroborated that she saw E.P. and Angel together and that she met Angel through E.P. *Id*. at 61:6-23.[14]

In a forensic interview just weeks after E.P. was recovered by the police, E.P. lied about aspects of her relationship with Chandan because she was "in love" and "trying to protect" him. Ex. 6 at 105:1-3, 105:12-16, 113:17-23. "[I]t was almost like brainwashing." *Id.* at 105:12-16. "As an adult," E.P. recognizes that "it was important to tell the truth," but "[a]s a child," she did not understand "how serious the situation was," and "really believed Chandan loved me." *Id.* at 115:24-116:3. Defendants' psychiatric expert, Dr. Matthew Norman, conducted an IME of E.P., and did not diagnose her with feigning, (Ex. 28 at 18:21-19:13 (Norman Dep.)), or malingering, (*Id.* at 87:7). He opines that child trafficking victims "often" have "legitimate reasons" to "try and protect their traffickers," (*Id.* at 106:19-107:3), to be "afraid" of their traffickers, (*Id.* at 107:4-13), to minimize "what they have experienced at the hands of their traffickers," (*Id.* at 107:14-20), and to "omit certain details about their trafficking," (*Id.* at 107:21-25).[15]

## STATEMENT OF THE ISSUES

E.P. disputes Defendants' statement of the first and third issues to the extent that the issues purport to require E.P. to prove that Defendants had actual or constructive knowledge that the venture violated the TVPRA *as to Plaintiff*. The language, "as to the plaintiff," comes from *dicta* in the Eleventh Circuit's *Red Roof* opinion, and the Eleventh Circuit has explicitly overruled it. *A.G. v. Northbrook Indus., Inc.*, 171 F.4th 1257, 1270 (11th Cir. 2026) ("Section 1595's

[14] A.M.'s memory on dates was refreshed by a May 2, 2014 police report documenting Black's assault of A.M. at Tucker Motel 6. Ex. 7 at 128:16-19. When A.M. was trafficked by Black at Tucker Motel 6, she got to know E.P., and their traffickers (Chandan and Black) worked together. Ex. 6 at 122:4-5; Ex. 25 at ⁋14.

[15] Plaintiff never mentioned the Rite4Us Inn in her forensic interview. Defendants' counsel brought it up in her deposition, repeatedly asked Plaintiff if she stayed there, and Plaintiff repeatedly denied it. Ex. 6 at 98:17-20, 100:4-6, 105:1-3, 105:22-23, 113:9-13, 115:18-21.

FILED UNDER SEAL

knowledge element requires constructive or actual knowledge that the undertaking or enterprise violated the TVPRA, nothing more."); *see also G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 558 (7th Cir. 2023) ("agree[ing]" with "the majority of courts," "that the statutory text does not require allegations and ultimately proof that the defendant knew or should have known of the specific victim who has brought the civil action."). Regardless, as shown below, there are material disputed facts as to each of the four issues Defendants identify, and summary judgment should be denied.

## LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (*per curiam*). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255; *Liberty Ins. Corp. v. Dixie Elec., L.L.C.*, 637 F. App'x 113, 116 (5th Cir. 2015).

## ARGUMENT

### I. E.P.'s allegations are detailed and corroborated by extensive evidence.

Defendants' lead argument that the Court should find, *as a matter of law*, that E.P.'s testimony is too "conclusory and "contradictory" to survive a Rule 56 motion, Mot. at 16-22,[16]

[16] Defendants' Motion for Summary Judgment as to the Merits is referred to throughout as "Mot." Page numbers are those stamped by CM-ECF in the top of the filing.

construes fragments of the record in the light most harmful to E.P. and relies on inapposite cases. The Court should reject Defendants' distorted rendition of the record and the law.

a. E.P.'s testimony is detailed and extensively corroborated.

In contending that "E.P.'s conclusory testimony comes nowhere close" to satisfying Rule 56, (Mot. at 16), Defendants disregard the record and the law.

***The record.*** Defendants assert that E.P. could not "describe any particular interaction she had with front desk staff" "in any detail." Mot. at 18. Untrue. E.P. testified in "detail" that she asked for new room keys "almost daily" at the front desk, and that the staff freely gave them without asking for her ID. Ex. 6 at 162:22-163:5. Similarly, she described going to the front desk, as a 15-year-old, to pay for a room rented under Chandan's name after telling the staff that her "boyfriend" was "at work" and "won't be off until like 12:00 tonight." *Id*. at 162:15-24. Again, "[t]hey never asked me for ID. They never verified how old I was. They just let me pay for the room and continued it in his name." *Id.* at 162:22-24. E.P. also explained that she "exchang[ed] towels out multiple times a day." *Id*. at 167:4-5. Additionally, Chandan and Angel went to the front desk to switch rooms multiple times.[17] Ex. 25 at ⁋⁋5-6.

While Defendants contend that "Plaintiff did not testify about any specific trafficking incident," Mot. at 18, she testified that she "was trafficked every day that I was [at Tucker Motel 6]," Ex. 6 at 159:24-25. She "stood in [the] doorway in provocative clothing and had multiple men,

[17] The TVPRA permits children to file claims up to 10 years after they turn 18, and Texas state law permits children to file claims up to 30 years after their trafficking. 18 U.S.C. 1595(c)(2); Tex. Civ. Prac. & Rem. Code Ann. § 16.0045(a)(4). No federal or Texas law requires that child victims of sex trafficking recall the names, heights, ages, and eye colors (among other physical characteristics) of hotel staff to survive a Rule 56 motion, contrary to Defendants' assertions. These are simply extra-textual requirements, made up by Defendants. No court in the country has ever required such feats of memory from child sex trafficking victims *as an element of their claims*. This is nothing more than a credibility attack, which is for the jury to resolve, not the Court.

at least five men a day coming in and out of [the] room" to pay her (a 15-year-old) for sex, *id.* at 204:15-17; Ex. 25 at ⁋⁋ 9-10. Angel and Price took the money. Ex. 6 at 204:15-17, Ex. 25 at ⁋10.[18]

Defendants' final argument that E.P. provided an "approximate time frame" that "varied," Mot. at 17, again ignores the record. When E.P.—a 15-year-old—was drugged, abused, and assaulted at Tucker Motel 6 by scores of men for weeks, she did not keep a calendar or a daily log. She does not know the exact dates she was at Tucker Motel 6. But that is not required to overcome a summary judgment motion. E.P.'s detailed testimony, to the best of her recollection, is more than enough, especially because it is corroborated by multiple eyewitnesses and contemporaneous records. In sum, E.P. testified that she ran away from home on **January 17, 2014**, that her trafficking began at Tucker Motel 6 by **mid-February 2014**, that she was trafficked by Angel from mid-February until on or around **March 31, 2014**, that Chandan rented a room at Tucker Motel 6 from **March 31, 2014 – April 3, 2014** to traffic E.P., that he continued to traffic E.P. at Tucker Motel 6 through **April 2014**, and that at some point in **late April or early May 2014**, Chandan took E.P. from Tucker Motel 6 to Orlando, Florida, where he trafficked her in other hotels before she was recovered by the police on **June 3, 2014**.[19]

Therefore, Defendants' argument that E.P.'s allegations are too "conclusory" does not square with the record.

---

[18] Defendants never asked E.P. to describe any of the sex buyers or their sexual assaults and rapes of E.P. at Tucker Motel 6. E.P.'s claims are not "conclusory" because Defendants did not ask.

[19] This timeline is corroborated by court records, police reports, room receipts, photographs, and the testimony of two eyewitnesses who saw E.P. at Tucker Motel 6 during the period. Defendants spotlight E.P.'s answer to one question in a lengthy deposition to argue that her "time frame" "varied." Mot. at 17. But Defendants do not reveal the question posed: "Q. Okay. Now, you said in Georgia, you were trafficked at the Tucker Motel 6, houses for outcalls, and at Chandler [sic] Road. Can you give me the time period for each of those?" Ex. 6 at 155:6-9. To the extent that E.P.'s answer to the compound question is even relevant and admissible under Rules 401 and 403, it at most creates a jury question about her trafficking at Tucker Motel 6 specifically, which is what this case is about. As shown, she gave specific testimony on that topic.

***The law.*** Defendants' argument also does not square with the law. Defendants cite one TVPRA case in support of their argument that E.P.'s testimony was too "conclusory." Mot. at 16 (citing *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147 (E.D.N.Y. 2020).) In *S.J.*, the Court granted a hotel-franchisor's motion to dismiss a TVPRA claim. *Id.* The "real issue" was that the plaintiff had only alleged that the franchisor-defendants had "knowledge or willful blindness of a general sex trafficking problem in low-budget lodgings," not that "the franchisor-defendants had the requisite knowledge of a specific sex trafficking venture." *Id.* at 154. Here, by contrast, E.P. has sued the owner-operator of Tucker Motel 6 and shown that Defendants facilitated her specific sex trafficking by renting her (a 15-year-old) a room without checking her ID, by giving her a new room key "almost daily" for months without checking her ID, by giving her new towels "multiple times a day," by engaging in a continuing business relationship with E.P. and her traffickers (and helping them switch rooms multiple times), and by actively assisting her traffickers Black and Chandan. Thus, *S.J.* is inapposite.[20]

Defendants remaining cases fare no better. Take *Hernandez*, a Title VII case. Mot. at 17. There, the employer-defendant produced company records showing the alleged discriminatory promotion decisions occurred outside the limitations period. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003). In response, the employee-plaintiff submitted a declaration asserting incidents occurred in the limitations period, but he "offer[ed] no support for these asserted dates other than his declaration" and "no specific dates for any of the actions." *Id.* Here, by contrast, E.P. has given "specific dates," her testimony is corroborated by records and

[20] *S.J.* says that a hotel "whose staff members 'rented rooms to people it knew or should have known w[ere] engaged in sex trafficking'" would violate § 1595(a) under "the plain language of the statute." *Id.* (quoting *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969 (S.D. Ohio 2019)). On this record, there is more than enough for a reasonable jury to find that.

eyewitnesses, and there are no records from Defendants showing E.P.'s trafficking occurred outside the limitations period. Thus, *Hernandez* does not help Defendants.

And take *K.S.*, a Title IX appeal of whether a school was deliberately indifferent to a student's sex-based discrimination claim on plain error review. Mot. at 16 (*citing K. S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x 780, 784 (5th Cir. 2017).) There, the Court did not credit the plaintiff-appellant's declaration submitted with summary judgment briefing about "various types of harassment" reported to the principal "one to two times a week" because it "contradicted" his sworn "deposition testimony" and did not include "supporting facts" about "what was told to Principal Conklin" and "what the response was." *K. S.*, 689 F. App'x at 785. Here, there is no "contradict[ion]" between a declaration submitted by E.P. in litigation and E.P.'s deposition, and further, her deposition testimony includes extensive "supporting facts" about "what was told to [Tucker Motel 6 staff]" and "what the response was." *K.S.* is unhelpful, too.[21]

b. <u>Defendants' argument based on *Scott* and its progeny ignores circuit authority and the record.</u>

Defendants' argument that E.P.'s case should be dismissed with prejudice because of purported contradictions between her deposition and a forensic interview recorded in the immediate aftermath of her child sex trafficking glosses over the record and ignores binding circuit authority. Defendants attack E.P.'s credibility while ignoring circuit authority that requires a jury to determine such questions, even in the face of contradictory evidence. *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 472 (5th Cir. 2019) ("Generally, '[i]n considering a motion for summary judgment,

[21] Defendants remaining cases do not move the needle either. *Israel* (Mot. at 16) *denies* a motion for summary judgment in a case about a truck driver's gross negligence after construing the evidence in the light most favorable to Plaintiffs. *Mata* (Mot. at 16) concerns an "appeal [that] [was] beyond question frivolous and wholly without merit," where appellant's counsel made "*ad hominem*" attacks and appellant argued "issues" that were "flatly contradicted by his own deposition." *Mata v. S. San Antonio Indep. Sch. Dist.*, 7 F.3d 230, 230 (5th Cir. 1993). Not so here.

a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier' statement'. [] 'In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made' earlier". (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980)). The entire purpose of a jury is to weigh conflicting evidence, *i.e.*, "questions of fact."

Defendants overstate the authorities they cite to argue that E.P. "cannot rest on testimony that is contradicted by record evidence." Mot. at 7. *Scott*, Mot. at 18, affirmed summary judgment in a 1983 case where unopposed contemporaneous video evidence of a high-speed chase destroyed the non-movant's account. Remarkably, Defendants do not address (or mention) binding Fifth Circuit authority that expressly cabins *Scott* to circumstances inapplicable here. *Scott* is an "***exceptional case with an extremely limited holding***." *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021) (emphasis added). "*Scott* was not an invitation for trial courts to abandon the standard principles of summary judgment by making credibility determinations or otherwise weighing the parties' opposing evidence against each other any time a video is introduced into evidence." *Id.* It is "difficult" and "demanding" for a summary judgment movant to establish that the *Scott* rule applies at summary judgment. *Id.* at 411. The non-movant must show that "the record eliminates any feasible claim that the nonmovant's account of events is true" before "a court [may] disregard the normal summary judgment rule[.]" *Id.*; *see also Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 730 (5th Cir. 2018) ("the standard imposed by the Supreme Court is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account."); *Pigott v. Gintz*, 23-30879, 2024 WL 5087911, at *5 (5th Cir. Dec. 12, 2024) (*per curiam*).

Defendants do not come close to meeting the "difficult" and "demanding" standard under *Aguirre*, binding circuit authority Defendants do not even mention. The only video at issue here is a recorded forensic interview taken weeks after E.P.'s trafficking at Tucker Motel 6 concluded. By contrast, *Scott* involved contemporaneous video of a high-speed chase. In other words, a video showing the actual incident at issue, *not* a video of a party *talking about* the incident at issue. For *Scott* to apply, the entirety of E.P.'s months of trafficking would have to have been recorded and show that E.P. was never present at Tucker Motel 6. A forensic interview recorded weeks after the trafficking at issue cannot "eliminate[] any feasible claim that [E.P.'s] account of events is true." *Aguirre*, 995 F.3d at 411. That, alone, is sufficient basis to reject Defendants' argument.

Further, under *Aguirre*, the *Scott* rule has "no application" where "there is any evidence challenging the video's accuracy or completeness." *Id.* at 410. In this case, there is abundant evidence—multiple eyewitnesses and contemporaneous records corroborate E.P.'s complete account. Also, during the forensic interview, E.P. was 15, had just endured months of trauma from child sex trafficking, was "in love" with Chandan, "brainwash[ed]," and "trying to protect" him. Ex. 6 at 105:1-3, 105:12-16, 113:17-23. So, she lied and told the forensic interviewer she stayed in a hotel off of Wesley Chapel, an area she had driven by countless times. *Id.* at 105:1-7.

Defendants' castigation of E.P.'s efforts to protect her trafficker as "utterly incoherent" (Mot. at 20-21) ignores this record evidence, and their own expert. Indeed, E.P.'s behavior in her forensic interview may not make sense to Defendants, but it makes sense to their own expert, Dr. Matthew Norman, who conducted an independent medical examination of E.P. Ex. 28 at 18:21-19:13, 87:7, 106:19-107:3, 107:4-13, 107:14-20, 107:21-25.[22]

---

[22] E.P.'s corroborated account shows that her concealment of Tucker Motel 6 to try to protect Chandan was not "utterly incoherent" anyway. If the police had visited the hotel, they would have found a room receipt, and likely also would have found witnesses, including A.M. and M.S. E.P.

Next, Defendants' contention that its room records are "affirmative evidence" that "proves" that E.P. was not trafficked at Tucker Motel 6 is absurd. Mot. at 21. *First*, Defendants *do have* a record of at least three nights in the same period that E.P. alleges she was trafficked where rooms were rented by her trafficker. Mot. at 21; Exs. 24A and B. That is affirmative documentary evidence *corroborating* E.P.'s account. *Second*, Defendants' G.M. admitted that Tucker Motel 6 staff routinely violated security rules and rented rooms without taking and recording ID or guest information. Ex. 2 at 64:2-7 ("always" "more people in a room" than recorded in system), 74:18-24 ("common issue"), 73:13-74:3. In fact, the hotel used an electronic check-in system that permitted these security violations. *Id.* at 84:6-8. There is also record evidence of Chandan staying at the hotel under a different name and paying Black for a room. Ex. 6 at 122:4-5; 161:1, 161:14-24; Ex. 25 at ⁋14. For these reasons, Defendants' reliance on Fed. R. Evid. 803(7) (Mot. at 21) is off base. That rule only applies if, among other things, "the opponent does not show that the possible source of the information or other circumstances indicate a lack of trustworthiness." *Id.* Here, there is substantial reason to question the "trustworthiness" and completeness of Defendants' room records.[23]

Therefore, Defendants have not met their burden under *Aguirre* to show that the forensic interview "eliminates any feasible claim that [E.P.'s] account of events is true."[24] It does not.

---

never testified that the hotel did not have cameras, only that she could not recall if they did in 2025 when she was deposed.

[23] Defendants point to *Neria* and *S.A.S.*, Mot. at 21, but there was no evidence in those cases that the records were unreliable (as there is here) or independent corroborative evidence that the incident at issue occurred (as there is here).

[24] None of the remaining cases that Defendants cite change the analysis (Mot. at 18-19 (citing *In re Buescher*, *Vinewood*, *Legacy*, and *Jones*)), because none depart from the *Aguirre* rule. Also, Defendants' argument that self-serving testimony must be disregarded at summary judgment is wrong, Mot. at 18-19. *See C.R. Pittman Const. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 Fed. Appx. 439, 443 (5th Cir. 2011) (collecting cases and quotes from other circuits); *see also*

FILED UNDER SEAL

## II. E.P. has produced extensive evidence supporting each element of her beneficiary claim under 18 U.S.C. § 1595(a).

E.P. has presented substantial evidence supporting each element of her beneficiary claim under 18 U.S.C. § 1595(a), and Defendants' claim to the contrary falls short. "The Fifth Circuit has not substantively engaged with beneficiary liability in the sex-trafficking context." *Doe (T.D.B.) v. G6 Hosp., LLC*, No. 9:23-CV-00174, 2026 WL 1008529, at *3 (E.D. Tex. Apr. 6, 2026) (Truncale, J.). "However, other circuits have distilled section 1595(a) into the following elements: (1) knowingly benefitting (2) from participation in a venture (3) that violated the TVPRA as to the plaintiff; and (4) actual or constructive knowledge that the venture violated the TVPRA as to the [plaintiff]." *Id.* (citing *Doe #1 v. Red Roof Inns*, 21 F.4th 714, 723 (11th Cir. 2021); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 (7th Cir. 2023)). Defendants argue the elements out of order. E.P. takes them in the order set forth by the statute, and this Court.

### a. There are disputed material facts as to whether Defendants knowingly benefited.

"Section 1595's 'knowing benefit' requirement is largely self-explanatory." *T.D.B.*, 2026 WL 1008529, at *3 (citations omitted). "The statute itself provides that a defendant is a knowing beneficiary when he receives 'anything of value' from a venture that he knows or should know is violating the TVPRA." *Id.* (citations omitted). "For example, a defendant who provides hotel rooms to known or suspected traffickers in exchange for money is a knowing beneficiary under section 1595(a)." *Id.* (citations omitted). So far, every hotel sex trafficking opinion in the country has agreed that the knowing benefit prong in hotel sex trafficking cases is satisfied by the rental of a room. *See, e.g., S.W. v. Tropical Paradise Resorts, LLC*, 25-CV-60771, 2026 WL 806786, at *6 (S.D. Fla. Mar. 24, 2026) (collecting cases).

---

*Henderson v. T&M Boat Rentals, LLC*, CV 17-2042, 2018 WL 3819930, at *5 (E.D. La. Aug. 10, 2018).

Under that standard, E.P. has presented sufficient evidence that Defendants "knowingly benefit[ed]" by showing that Angel rented rooms, Chandan rented rooms, Black rented rooms, and E.P. repeatedly bought condoms. Defendants' arguments to the contrary about its "security measures," (Mot. at 26), are for the jury.

b. <u>There are disputed material facts as to whether Defendants participated in a venture.</u>

E.P. has presented sufficient evidence that Defendants participated in a venture by transacting business with her (a child) and her traffickers for weeks, and by affirmatively assisting their criminal enterprise at Tucker Motel 6.[25]

This Court has "adopted the Seventh Circuit's reading" of "participation in a venture." *T.D.B.*, 2026 WL 1008529, at *3 (citing *Salesforce*, 76 F.4th at 558-560). In *Salesforce*, the Seventh Circuit ruled that "participation in a venture" means "culpable assistance to a wrongdoer, which requires only a desire to promote the wrongful venture's success." *Id.* It "does not require direct participation in the sex trafficking." *Salesforce*, 76 F.4th at 559. A plaintiff raising a Section 1595(a) beneficiary claim "need only allege 'a commercial venture, like expanding or running a business.'" *Doe (E.M.B.) v. G6 Hosp., LLC*, No. 9:23-CV-00173-MJT-CLS, 2025 WL 2556104, at *6 (E.D. Tex. Feb. 3, 2025) (Stetson, J.) (quoting *Salesforce*, 76 F.4th at 554). "[P]roviding hotel rooms [] would satisfy Section 1595's 'participation' element," but such "direct involvement goes beyond what the statutory text requires." *Salesforce*, 76 F.4th at 559. "There only needs to be proof

---

[25] Defendants narrow the ventures alleged in E.P.'s First Amended Complaint. *Compare* Mot. at 22-23 *with* Doc. 59-1 at ⁋⁋101, 103, 114, 115. Contrary to Defendants' summary, E.P. alleges that Defendants participated in a venture by operating Tucker Motel 6 and renting rooms to E.P.'s *traffickers* (Defendants wrongly use the singular) notwithstanding red flags and signs showing E.P. was a child sex trafficking victim; by engaging in ongoing business relations with E.P.'s traffickers through rental of rooms and sale of goods; and by being in direct association with E.P.'s traffickers through repeated conversations and business transactions.

of [a hotel] 'assisting, supporting, or facilitating' a venture that itself violates § 1591." *Doe (E.M.B.)*, 2025 WL 2556104, at *6.

Because there is evidence that Defendants "provid[ed] hotel rooms" directly to E.P.'s traffickers (and indirectly to her traffickers by allowing E.P., a child, to extend a room reservation and get new room keys daily in violation of Defendants' security rules), a reasonable jury could find that Defendants participated in a venture under *Salesforce.* That is sufficient reason to reject Defendants' argument.

Indeed, in the Eleventh Circuit, lesser facts on "participation in a venture" warrant a jury trial.[26] *See A.G. v. Northbrook Indus., Inc.*, 171 F.4th 1257 (11th Cir. 2026). In *A.G.*, the Court "clarif[ied]" that "participation in a venture" means "something more than engaging in an ordinary buyer-seller transaction is required." *A.G.*, 171 F.4th at 1267, 1269 (citation omitted). Though "something more" is "not very illuminating guidance," "this consolidated appeal provides ***examples of facts which satisfy***" it. *Id.* at 1269 (emphasis added). *One example* of "something more" is "offering 'personalized support'" to a sex trafficker. *Id.*

Given the "facts" of *A.G.* "satisf[ied]" the "participation in a venture" element at the Rule 56 stage—and the Eleventh Circuit's interpretation is only "slightly different" from the Seventh Circuit's, *Doe (K.E.C.)*, 750 F. Supp. 3d at 731—*A.G.*'s facts warrant comparison here. At summary judgment, plaintiff A.G. showed that she was at the subject hotel for *three nights total* as a 17-year-old. *A.G.*, 171 F.4th at 1264. In vacating the district court's order granting summary

[26] As this Court has noted, the Eleventh Circuit's analysis of "participation in a venture" is "persuasive" and only "slightly different" from the Seventh Circuit's. *Doe (K.E.C.) v. G6 Hosp., LLC*, 750 F. Supp. 3d 719, 730-731 (E.D. Tex. 2024) (Truncale, J.); *see also Doe (S.M.A.) v. Salesforce, Inc.*, No. 3:23-CV-0915-B, 2024 WL 1337370, at *13 (N.D. Tex. Mar. 28, 2024) (there is "no substantive distinction between the two [circuit's interpretations]."); *E.M.B.*, 2025 WL 2556104, at *6 ("minutely divergent interpretations"). This Court decided to "employ the Seventh Circuit's articulation" because it "is slightly more specific." *K.E.C.*, 750 F. Supp. 3d at 731.

judgment, the Eleventh Circuit cited the following evidence: testimony and documents showing the "hotel's general friendliness toward and awareness of sex trafficking," testimony from A.G. and G.W. (another minor trafficked with A.G. who filed a lawsuit) that "[their] traffickers would spend 15-20 minutes talking with hotel staff per day," and A.G.'s and G.W.'s testimony that hotel staff allowed A.G. and G.W. back into a room without identification after speaking with their traffickers. *Id.* Based on those facts, the Eleventh Circuit ruled that summary judgment was improper because "A.G. and G.W. produced sufficient circumstantial evidence for a reasonable jury to infer that Northbrook offered personal support to Zaccheus Obie's sex trafficking operation, which is enough to show 'participation in a venture.'" *Id.* at 1270–71. The Court "acknowledge[d]" that the evidence of the hotel's "participation in a venture" was "not overwhelming," but "[i]t does not need to be, and in cases where minor sex trafficking victims assert beneficiary claims we assume it rarely is." *Id.* at 1271.

Unlike the record evidence in *A.G.*, the allegations here are "overwhelming." E.P. was at Tucker Motel 6 for approximately 8 weeks (from at least mid-February to mid-April), not three days. Tucker Motel 6 did not just show "general friendliness toward and awareness of sex trafficking," G.M. Primm testified that commercial sex crimes were a "problem" at Tucker Motel 6, that she knew underage girls were sold for sex at the hotel, that the hotel should have been "shut down," and that staff routinely disregarded security rules on checking IDs before giving out room keys. More, E.P. has shown that Defendants directly "assist[ed], support[ed], or facilitate[ed] a venture that itself violates § 1591" by renting her a room and giving her new room keys "almost daily" for rooms rented to her traffickers in which she was exploited. *Doe (E.M.B.)*, 2025 WL 2556104, at *6. Whereas in *A.G.* a jury could "reasonably infer" the hotel's "participation in a venture" based on "circumstantial evidence," here there is *direct* evidence, including Angel and

FILED UNDER SEAL

Chandan renting hotel rooms from Defendants for extended periods and switching rooms regularly, E.P. renting a room from Defendants, E.P. getting new keys "almost daily," and the hotel staff assisting one of E.P.'s traffickers, Black, who worked with Chandan, to evade law enforcement. There was no comparable evidence in *A.G.* Nor was there evidence in *A.G.*, like there is here, that E.P.'s trafficking continued after Defendants were shown a law enforcement notice that E.P. was a runaway child.

Even if the Court disagrees and finds that the evidence here is not "overwhelming," it does "not need to be" to overcome Defendants' motion. *A.G.*, 171 F.4th at 1271. Because *A.G.*'s record was enough to warrant a jury trial, E.P.'s stronger evidence of participation is enough, too.[27]

Finally, Defendants' contention that proof of "participation in a venture" in a ***child*** sex trafficking case "requires" evidence of a "continuous business relationship" involving "repeated interactions" "for several years" misrepresents the law. Mot. at 25. The statute does not say that, and Congress did not evince intent to make it that difficult on a child victim to bring a viable beneficiary claim. The Seventh Circuit itself does not require so much. It merely "agree[d] with the district court that a plaintiff ***may sufficiently allege*** such 'culpable assistance' by showing 'a continuous business relationship' between the participant and the trafficker." *Salesforce*, 76 F.4th and 559 (emphasis added). What is sufficient is not necessary. A.G. confirms that a three-day stay at a hotel may suffice.[28]

---

[27] Defendants ask this Court to apply the Eleventh Circuit's *Red Roof* standard, which is exactly what the Eleventh Circuit did in *A.G.* Mot. at 24, n.7. *A.G.* defeats Defendants' motion.

[28] The Court's order granting summary judgment in *T.D.B.*, 2026 WL 1008529 is distinguishable. In *T.D.B.*, the victim, who was an adult, rented the room, and there was no evidence of a "business relationship" between the trafficker and the hotel. *Id.* at *4. Renting a hotel room to an adult victim may look like "an ordinary buyer-seller transaction," *A.G.*, 171 F.4th at 1267, so more is required to prove "participation in a venture" in an adult trafficking case, particularly because adult trafficking requires proof of force, fraud, or coercion. *T.D.B.*, 2026 WL 1008529, at *4; 18 U.S.C. § 1591. Here, the analysis diverges because there was "a business relationship" between

If a "continuous business relationship" involving "repeated interactions" is required, it is met here through the evidence showing that Angel, Chandan, and Black rented rooms at Tucker Motel 6 for weeks to traffic E.P. and switched rooms regularly (requiring regular conversations with staff); that E.P. went to the front desk "almost daily" to get new room keys and once to extend a room rented to her traffickers; that E.P. wore provocative clothes while loitering in common areas monitored by hotel staff to attract "at least" five buyers per day; and that E.P. asked housekeeping for towels multiple times per day. Additionally, Defendants acted as lookouts for Black, one of E.P.'s traffickers, who worked with Chandan, and at least some of Defendants' participation occurred after law enforcement visited the hotel with a notice that E.P. was a runaway child. Thus, there is at least a jury question as to Defendants' "participation in a venture."

c. <u>There are disputed material facts as to whether the venture engaged in an act in violation of the TVPRA.</u>

E.P. has presented sufficient evidence to create a material dispute as to whether the venture "engaged in an act in violation of" the TVPRA. 18 U.S.C. § 1595(a); *see also K.E.C.*, 750 F. Supp. 3d at 736. Indeed, E.P. has shown that she was sex trafficked as a child at Tucker Motel 6 from at least February 2014 to April 2014, during which time she saw "at least" five sex buyers every day and loitered in hotel common areas to solicit and attract the buyers. Defendants' employees continuously rented rooms to Plaintiff's traffickers, helped Plaintiff's traffickers switch rooms multiple times, allowed Plaintiff (a 15-year-old) to extend a room rented to one of her traffickers, and "almost daily" gave Plaintiff new room keys without ID. Defendants' staff broke security rules

---

Defendants and E.P.'s traffickers. There also was a "business relationship" between Defendants and E.P. (a child) in violation of Defendants' security rules. A reasonable jury could find based on this evidence (not to mention the lookout evidence) that Defendants engaged in transactions that were not "ordinary" and that show "culpable assistance," *T.D.B.*, 2026 WL 1008529, at *4. *A.G.* held as much where minors were given access to a room without ID *one time*.

FILED UNDER SEAL

routinely in dealing with E.P., and acted as lookouts for at least one of her traffickers. This evidence creates a jury question on the third element. *See, e.g., A.G.,*[29] 171 F.4th at 1272-3 (finding jury question as to whether the venture "engaged in an act in violation of" the TVPRA as to victim C.B. because a reasonable jury could find that the hotel "applied [its] room placement and cleaning policies to [the trafficker]" to "support" the trafficker and could find that the hotel had "constructive knowledge" that the trafficker "committed an act in violation of § 1591").[30]

d. <u>There are disputed material facts as to Defendants' actual or constructive knowledge</u>.[31]

Whether Defendants had actual or constructive knowledge comes down to material disputed facts that cannot be resolved as a matter of law at summary judgment.

Defendants argue that they did not know that E.P. was "harbored" for commercial sex acts. Mot. at 27-28. But Defendants ignore that 18 U.S.C. § 1591(a)(1) proscribes a list of acts—"recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits[.]" Evidence that Defendants knew or should have known of "***an act*** in violation" is enough. § 1595(a) (emphasis added). Defendants need not be aware of all the acts.

---

[29] The *A.G.* appeal consolidated three appeals from victims A.G., G.W., and C.B.

[30] At least one company that owned and operated a hotel (like Defendants owned and operated Tucker Motel 6) has been *criminally convicted* for conduct like that at issue here. *See United States v. Bhimani*, 3:17-cr-324, 2021 WL 5179196 (M.D. Pa. Nov. 8, 2021). The evidence in this case not only satisfies the lesser civil constructive knowledge standard (while also meeting the participation and act in violation prongs), but also the same type of evidence has been used to meet the higher criminal standard under § 1591.

[31] Defendants argue that they "must have had actual or constructive knowledge that 'the venture in which they participated … violated the TVPRA ***as to the plaintiff***.'" Mot. at 27 (quoting *K.E.C.*) (emphasis added). *K.E.C.* relied on *dicta* in *Red Roof* for the "as to the plaintiff" language, which the Eleventh Circuit has explicitly overruled. "Section 1595(a) does not say that." *A.G.*, 171 F.4th at 1270 (11th Cir. 2026) ("[W]e do not agree with the [*Salesforce*] dissent's atextual requirement that beneficiaries must know the identity of the trafficking victim."). "Section 1595's knowledge element requires constructive or actual knowledge that the undertaking or enterprise violated the TVPRA, nothing more." *Id.*; *see also Salesforce*, 76 F.4th at 558.

Here, a reasonable jury could find that Defendants knew or should have known that E.P. was subject to virtually all the acts proscribed by § 1591(a)(1) at Tucker Motel 6 from at least February 2014 to April 2014. For example, a reasonable jury could find that Defendants knew or should have known that E.P., a 15-year-old girl, was "**maintain[ed]**" at Tucker Motel 6 for months by adult traffickers (Angel, Chandan, Black) for commercial sex acts because E.P. lived there (a hotel that the G.M. believed needed to be "shut down" because of its rampant commercial sex crime) for approximately two months during her freshman year of high school; E.P. requested and received new keys "almost daily" for rooms rented to adults who were not her parents without ID of her own; E.P., scantily-clad, extended a room reservation for an adult man unrelated to her without ID of her own; E.P. loitered in hotel common areas in provocative clothing to meet "at least" five male buyers per day; and E.P. asked housekeeping for new towels multiple times per day. This conduct continued *after* the hotel was shown a notice stating that E.P. was a missing child, and when the hotel acted as a lookout for Black. Based on the same conduct, a reasonable jury could find that Defendants knew or should have known that E.P. was a 15-year-old "**provided**," "**obtained**," "**solicited**," "**advertised**," and "**patronized**" for commercial sex acts at Tucker Motel 6. Likewise, a reasonable jury could rely on the same evidence to find that Defendants knew or should have known that E.P. was "**harbored**."[32]

Defendants' final assertion that there is "no evidence to suggest that Defendants had actual or constructive knowledge of E.P.'s minor status" ignores the facts. Mot. at 28. A.M. testified that

---

[32] Defendants assert that E.P. was never "seen with her trafficker," (Mot. at 27), and that he did not "accompan[y] her in public areas of the Tucker Motel 6," (Mot. at 28). These assertions are wrong, and Defendants cites do not support them. Mot. at 27-28 (citing Ex. 6 at 161:5-7 ("Q. Would you check in with Chandan, or would he check in alone? A. I believe he checked in by himself.").) That testimony does not say that E.P. was never "seen with her trafficker," or that he did not "accompan[y]" her in common areas. She was seen with him, and he did accompany her in common areas. Ex. 25 at ⁋⁋12-14.

law enforcement came to Tucker Motel 6, showed her a notice stating that E.P. was a missing child, and entered the Tucker Motel 6 front office with the same notice. That, alone, is sufficient for a reasonable jury to find that Defendants knew or should have known E.P.'s age.

Defendants also misstate the law. E.P. only needs to present evidence that Tucker Motel 6 had a "reasonable opportunity to observe" E.P. Knowledge of age is irrelevant to acts in violation of child sex trafficking laws. In relevant part, § 1591(c) states that for a 1591(a)(1) prosecution "in which the defendant had a reasonable opportunity to observe" the victim, "the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years." 18 U.S.C. § 1591(c); *see also United States v. Whyte*, 928 F.3d 1317, 1329–30 (11th Cir. 2019), *cert. denied sub nom. Castro v. United States*, 140 S. Ct. 874, 205 L. Ed. 2d 499 (2020), and *cert. denied*, 140 S. Ct. 875, 205 L. Ed. 2d 497 (2020) ("Proof that a defendant had a 'reasonable opportunity to observe' the victim relieves the government of its burden of proving that the defendant [] knew or recklessly disregarded the victim's age."). As discussed, there is substantial evidence that Defendants had "reasonable opportunity to observe" E.P.'s age, including when they were shown a notice about E.P. identifying her as a missing child, when they rented her a room, when they gave her room keys, when housekeeping gave her new towels multiple times a day, and when she loitered in common areas. Therefore, Defendants' arguments on actual or constructive knowledge fail.

**III. E.P.'s Texas state law claim succeeds.**

E.P.'s state law claim succeeds for the same reasons that her TVPRA claim succeeds, and Defendants' arguments to the contrary are misguided. To start, E.P.'s Texas state claim is not time barred. For child victims of sex trafficking, a 30-year statute of limitations applies. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.0045(a)(4) (providing that a child bringing a sex trafficking claim

involving conduct in violation of § 20A.02(a) may sue "not later than 30 years after the day the cause of action accrues."); Doc. 59-1 at ⁋118 ("Plaintiff has suffered substantial physical and psychological injuries as a result of being trafficked and sexually exploited at the Motel 6 in violation of Texas Penal Code § 20A.02(a)"). E.P.'s lawsuit, filed on March 11, 2024 (Doc.1), about trafficking in 2014, is thus well within the statute of limitations.

Further, E.P.'s Texas state claim succeeds for the same reasons that her TVPRA claim succeeds. Defendants suggest that the "participation in a venture" element of the Texas state law has been construed "more strictly" and means "more than mere passive acquiescence in trafficking conducted by others." Mot. at 31-32. According to Defendants, usually an "overt act in furtherance of the venture" is required. *Id.* That standard is met here through the evidence that Defendants regularly violated their security "rule[s]" and gave room keys to E.P., a 15-year-old, for rooms rented to adult men and a woman she was not related to even after the police visited the hotel lobby with a notice about E.P. being a runaway child. It is also satisfied through the evidence that Defendants allowed E.P. to extend a room rental and pay for a room rented to her "boyfriend" who was away at work, and through the evidence that the hotel staff assisted and supported Black, who was one of E.P.'s traffickers, and who worked with Chandan to traffic E.P.[33]

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court deny Defendants' motion.

---

[33] Additionally, as shown in *Bhimani*, Defendants' actions to facilitate E.P.'s trafficking—*e.g.*, supporting the trafficking of Plaintiff by following their practice of breaking security rules on checking IDs before giving out room keys and renting rooms and by acting as a lookout for E.P.'s traffickers—is sufficient, if credited by a jury, to support a criminal conviction for the manner in which Tucker Motel 6 was operated. *Bhimani*, 2021 WL 5179196. Because there is ample evidence to satisfy § 1591, the same evidence would satisfy the perpetrator claims under Texas state law.

Respectfully submitted this 21st day of May 2026.

/s/ David H. Bouchard
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859
Oto U. Ekpo
oto@finchmccranie.com
Georgia Bar No. 327088

FINCH McCRANIE, LLP
229 Peachtree Street NE
Suite 2500
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

Ron Estefan
ron@ronestefanlaw.com
Texas Bar No. 00785851

THE ESTEFAN FIRM, P.C.
2306 Mason St.
Houston, TX 77006
(713) 333-1100 - Telephone

Patrick J. McDonough
pmcdonough@atclawfirm.com
Georgia Bar No. 489855
Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999
Jennifer M. Webster
jwebster@atclawfirm.com
Georgia Bar No. 760381

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard
Suite 4000
Duluth, Georgia 30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile

*Attorneys for Plaintiff*

FILED UNDER SEAL

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2026, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system. The foregoing will be served on all counsel of record via email the same day.

*/s/ David H. Bouchard*
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859

FINCH McCRANIE, LLP
229 Peachtree Street NE
Suite 2500
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

*Attorney for Plaintiff*

**CERTIFICATE OF SEALING MOTION**

Pursuant to Local Rule CV-5(a)(7), I hereby certify a motion to seal the unredacted version of Plaintiff's Response in Opposition to G6 Defendants' Motion for Summary Judgment as to the Merits has been filed.

*/s/ David H. Bouchard*
David H. Bouchard