FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **E.P.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION NO.:** |
| **vs.** | : | |
| | : | **4:24-cv-00216** |
| **G6 HOSPITALITY, LLC;** | : | |
| **G6 HOSPITALITY** | : | |
| **PROPERTY LLC;** | : | |
| **MOTEL 6 OPERATING L.P.** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF E.P.'S RESPONSE IN OPPOSITION TO G6 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CAUSATION AND PUNITIVE DAMAGES**

FILED UNDER SEAL

## TABLE OF CONTENTS


**INTRODUCTION** .......... 1

**STATEMENT OF MATERIAL FACTS** .......... 2

**I. Tucker Motel 6's Rampant Crime, and "Problem" with Commercial Sex Crimes.** .......... 3

**II. Tucker Motel 6's Policies and Practices Facilitated Commercial Sex Crimes.** .......... 4

**III. Sex Trafficking of 15-year-old E.P. at Tucker Motel 6 in 2014.** .......... 7

**a. E.P. was sex trafficked at Tucker Motel 6 from at least February – April 2014.** .......... 7

**b. Police Visit Tucker Motel 6 with a Flyer about E.P., a Missing Child.** .......... 10

**c. E.P.'s interactions with Tucker Motel 6 staff** .......... 11

**IV. E.P.'s Trauma as a Result of Being Sex Trafficked at Tucker Motel 6.** .......... 11

**a. E.P.'s testimony.** .......... 12

**b. Dr. Norman's Report and Testimony.** .......... 14

**LEGAL STANDARD** .......... 15

**ARGUMENT** .......... 16

**I. Summary judgment is not proper as to causation because of material disputed facts.** .......... 16

**a. Under binding authority, direct and circumstantial evidence from fact and lay witnesses is sufficient to prove causation as to compensatory damages.** .......... 17

**b. E.P.'s fact and lay opinion testimony creates a material disputed fact as to whether Defendants caused E.P.'s compensatory damages.** .......... 22

**CONCLUSION** .......... 30

# TABLE OF AUTHORITIES

**Cases**

*Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 206 (5th Cir. 2017)............................. 28
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)....................................................... 16
*Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614–15 (2009)..................... 25
*DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007)................................................................ 20
*Ditullio v. Boehm*, 662 F.3d 1091, 1096-1102 (9th Cir. 2011)..................................................... 28
*Ditullio v. Boehm*, No. 3:09-cv-113, 2010 WL 11534265........................................................... 17
*Doe (K.E.C.) v. G6 Hosp., LLC, et al.*, No. 1:23-cv-270 (E.D. Tex. June 16, 2025).................. 17
*E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635 (7th Cir. 2010)........................................................... 19
*EEOC v. AutoZone Inc.*, 631 F. Supp. 2d 1076, 1080 (C.D. Ill. 2009)....................................... 19
*Flock v. Scripto–Tokai Corp.,* 319 F.3d 231, 237 (5th Cir.2003)................................................ 22
*Francisco v. Susano*, 525 Fed. Appx. 828, 834 (10th Cir. 2013)................................................ 28
*Gomez v. Palmer*, No. 11 C 1793, 2016 WL 212800, at *8 (N.D. Ill. Jan. 19, 2016)................. 19
*Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004)................ 20, 24
*J.G. v. Northbrook Industries, Inc.*, No. 1:20-CV-5233-SEG, 2025 WL 1899683 at *3 (N.D. Ga. July 9, 2025)........................................................................................................................ 28
*J.K. and Susie L. Wadley Research Inst. and Blood Bank v. Beeson*, 835 S.W.2d 689, 698 (Tex.App.—Dallas 1992, *writ denied*)........................................................................................ 22
*K.M. v. Reva Properties, LLC*, No. 1:22-cv-3991, 2024 WL 1217420........................................ 17
*Liberty Ins. Corp. v. Dixie Elec., L.L.C.*, 637 F. App'x 113, 116 (5th Cir. 2015)....................... 16
*Lindsley v. TRT Holdings Inc.*, No. 3:17-CV-2942-X, 2023 WL 11983791, at *7 (N.D. Tex. Mar. 6, 2023)........................................................................................................................... 20
*Moore v. Rubin*, 724 F. Supp. 3d 93, 106 (E.D.N.Y. 2024)......................................................... 28
*Osterhout v. Bd. of Cnty. Commissioners of LeFlore Cnty., Oklahoma*, 10 F.4th 978, 997 (10th Cir. 2021)....................................................................................................................... 19
*Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062, 1066 (5th Cir. 2016)................................ 20
*Poincon v. Offshore Marine Contractors, Inc.*, 9 F.4th 289, 298 (5th Cir. 2021)........................ 22
Rule 601............................................................................................................................ 17, 23
*Scafidi v. B. Braun Medical, Inc.*, No. 8:22-cv-2772, 2024 WL 382397.................................... 19
*Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 109–10, 80 S. Ct. 173, 175–76, 4 L. Ed. 2d 142 (1959)........................................................................................................... 20, 22
*Smith v. Wade*, 461 U.S. 30, 48 (1983)......................................................................................... 28
*Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338, 346-347 (2013).......................... 23
*Tindall v. H & S Homes, LLC*, No. 5:10-cv-44, 2011 WL 5007827............................................ 19
*Tolan v. Cotton*, 572 U.S. 650, 657 (2014).................................................................................. 16
*Tompkins v. Cyr,* 202 F.3d 770, 782 (5th Cir.2000).................................................................... 22
*United Gas Pub. Serv. Co. v. Texas*, 303 U.S. 123, 140, 58 S.Ct. 483, 82 L.Ed. 702 (1938)...... 22
*United States v. Chavez-Lopez*, 767 F. App'x 431, 433 (4th Cir. 2019)...................................... 18

FILED UNDER SEAL

*United States v. Jackson*, 549 F.3d 963, 975 (5th Cir. 2008) .................................................... 18
*United States v. Sanjar*, 876 F.3d 725, 738 (5th Cir. 2017)....................................................... 18
*University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338, 346-347 (2013)..... 23
*W.K. v. Red Roof Inns, Inc.*, No. 1:20-CV-05263-VMC, 2024 WL 2892322, at *2 (N.D. Ga. June 10, 2024)................................................................................................................................ 28
*W.K. v. Red Roof Inns, Inc.*, No. 1:20-cv-5263, 2024 WL 2892322 .......................................... 17
*Warfaa v. Ali*, 1 F.4th 289, 293-96 (4th Cir. 2021) ..................................................................... 28
*Wunstell v. BP, P.L.C.*, 2024 WL 4100496, at *4 (5th Cir. Sept. 6, 2024) ................................. 21

**Statutes**

§ 15.7.............................................................................................................................................. 28
§ 29, p. 493 (2005)........................................................................................................................... 26
18 U.S.C. § 1593.............................................................................................................................. 25

**Rules**

701........................................................................................................................................... 17, 21
876 F.3d at 738 ................................................................................................................................ 19
Fed. R. Civ. P. 56(a) ........................................................................................................................ 16
Fed. R. Evid. 601 ............................................................................................................................. 18
Fed. R. Evid. 602 ............................................................................................................................. 18
Fed. R. Evid. 701 ........................................................................................................................ 18, 19
Rule 56 ............................................................................................................................................... 4
Rule 701 ......................................................................................................................... 17, 18, 19, 23
Rule CV-7 .......................................................................................................................................... 2
Rules 601 ......................................................................................................................................... 21

**INTRODUCTION**

In 2014, when she was 15 years old, Plaintiff E.P. was sex trafficked for months at Tucker Motel 6, a hotel that Defendants solely owned and operated. Unsurprisingly, she has attested that as a result of being sexually assaulted and raped as a child hundreds of times at Tucker Motel 6, she suffers from depression, anxiety, nightmares, flashbacks, sexual dysfunction, and panic attacks. Is she lying? Defendants say so. But Defendants' own paid medical expert found that E.P. was *not* malingering or feigning her reported symptoms. And Defendants' expert did not rule out that her emotional and mental trauma was caused by her trafficking at Defendants' motel. He just could not clinically apportion such harm to the hotel. But, he admitted, a factfinder could.

E.P.'s own testimony and attestation make common sense, and a jury can easily understand the testimony without the aid of an expert. What child, sold for sex to hundreds of strange men in a motel overrun with sex crimes, *wouldn't* suffer some harm as a result? Defendants' position is indeed an extraordinary one. Child sex trafficking: no harm, no foul.

Tucker Motel 6 was the perfect place for traffickers to sell a child to scores of men for sex. The hotel's General Manager admitted that it had a "problem" with commercial sex crimes. She "couldn't put a number" on how many women and girls were sold for sex, but "know[s]" she "s[aw] quite a bit." When Defendants refused the G.M.'s repeated requests for more security, she moved off the property due to her own safety concerns, despite the fact that she was required by Defendants to live there. The staff was overwhelmed with the crime, routinely ignored basic safety rules, and helped criminal actors at the hotel. Still, Defendants operated and profited from the crime that filled their hotel's rooms. Defendants accepted cash from E.P. (a child) to extend a room reserved by her 32-year-old trafficker, "almost daily" gave her room keys without asking for ID, continuously rented rooms to her traffickers and helped them switch rooms, and directly enabled her trafficking by serving as lookouts for her traffickers.

Now, Defendants ask the Court to find *as a matter of law* that E.P. has not presented sufficient evidence to create a jury question on causation or punitive damages. Both arguments border on the absurd. Neither Texas nor federal law require victims of child sex abuse to hire experts to establish causation as to emotional and mental trauma. E.P.'s extensive testimony on the subject is more than enough under binding authority, especially considering that Defendants' own expert found that E.P. is not feigning or malingering. Given the rampant commercial sex crimes at the property, and the hotel's dealings with E.P. and her traffickers, there is at least a fact dispute regarding whether the harms she suffered were foreseeable. Likewise, the record evidence showing that an out-of-control hotel with prolific commercial sex crimes facilitated E.P.'s child sex trafficking creates a jury question as to punitive damages. Therefore, Defendants' motion should be denied.

## STATEMENT OF MATERIAL FACTS

On April, 30, 2026, Defendants filed two dispositive motions—a Motion for Summary Judgment as to Causation and Punitive Damages (Doc. 164) and a Motion for Summary Judgment as to Merits (Doc. 165).[1] In both motions, Defendants' "Statement of Undisputed Facts" ignores most of the record evidence and construes fragments of the record in the light most harmful to E.P. For a more fulsome background regarding E.P.'s claims and the record evidence, E.P. refers the

[1] Defendants' Motion for Summary Judgment on the Merits (Doc. 165) and Motion for Summary Judgment as to Causation and Punitive Damages (Doc. 164) together exceed the 30-page limit on "dispositive" summary judgment motions in E.D. Tex. Local Rule CV-7, but Defendants did not ask for leave to file excess pages. Although styled as separate motions, both briefs purport to address "dispositive" issues. Indeed, Doc. 165 is titled a "Merits" brief, and Doc. 164 argues that "Defendants are entitled to summary judgment" because of E.P.'s alleged failure to prove causation, (Mot. at 19). The Court should decline to consider briefing exceeding the 30-page limit applicable to "dispositive" summary judgment briefs.

Court to E.P.'s Statement of Material Facts in her Response in Opposition to Defendants' Motion for Summary Judgment as to the Merits.

Here, E.P. addresses evidence relevant to Defendants' challenge to the adequacy of the evidence supporting causation and punitive damages. As demonstrated below, there are material disputed facts warranting a jury trial on both issues.

## I. Tucker Motel 6's Rampant Crime, and "Problem" with Commercial Sex Crimes.

At all relevant times, Defendants directly owned and operated (and did not franchise) Tucker Motel 6, and employed all staff for Tucker Motel 6. Ex. 2 at 16:6-17:19 (30(b)(6) Dep. Walker); Ex. 3 at 10:21-11:4, 30:15-21 (G.M. Primm Dep.); Ex. 4 at 57:6-15 (30(b)(6) Dep. Ping).

Defendants admit through their own G.M. that crime was "common," "frequent," and "persistent" at Tucker Motel 6. Ex. 3 at 17:9-14; Ex. 5 at 113:15-114:1 ("very high crime area") (Martin Dep.). The "environment" at the hotel "was really rough" and "intense." Ex. 3 at 13:2, 142:23. There were "always negative reviews" about "traffic" at the hotel, namely "people walking around or lingering." *Id.* at 117:22-118:3; Ex. 5 at 19:16 ("a lot of foot traffic on the property").

Defendants' G.M. admitted that Tucker Motel 6 had a "problem" specifically with commercial sex crimes. Ex. 3 at 91:16-20, 17:15-25. G.M. Primm "couldn't put a number" on how many women (over 18) and girls (under 18) were sold for sex at Tucker Motel 6, but she "know[s]" that she "s[aw] quite a bit." *Id.* at 17:15-25. The hotel's cameras showed "a lot of [men] in and out, in and out, in and out" of rooms. *Id.* at 86:15-87:3, 142:24-25 ("constantly see guys exchanging things in hands or people going in and out of rooms"); Ex. 5 at 100:13-15 ("we talked about heavy traffic to rooms, there was a lot of that"). Tucker Motel 6 was "busy" with commercial sex crimes. Ex. 3 at 86:15-17. Commercial sex crimes occurred at Tucker Motel 6 during "all times of day," on "all parts of the property," in "multiple rooms on the property." *Id.* at 87:4-11.

The commercial sex market was so entrenched at Tucker Motel 6 that sex workers came to G.M. Primm to see if she could help them get paid for their work. *Id.* at 91:18-92:10 ("If you're out there selling yourself, I can't help you collect your money.") G.M. Primm "noticed pimps" because they would talk to her about the girls and women they had on the property. *Id.* at 88:17-23. One trafficker at the property even solicited G.M. Primm's daughter. *Id.* at 15:3-11. Because of that, and because she "didn't feel safe" at Tucker Motel 6, G.M. Primm moved out of the hotel, even though she was *required* to live there. *Id.* at 18:4-13; Ex. 2 at 181:3-25, 184:11-13.

At least eight witnesses, including E.P., have confirmed that commercial sex crimes were prolific at Tucker Motel 6.[2] So have contemporaneous records. Ex. 17 at EP-000006, 10 (DeKalb County PPT analysis showing crimes from 2010 – 2014); Ex. 18 (6/6/2014 email re "teenage prostitution").

## II. <u>Tucker Motel 6's Policies and Practices Facilitated Commercial Sex Crimes.</u>

Commercial sex crimes boomed at Tucker Motel 6 year after year (Ex. 3 at 21:7-10) because of Defendants' inadequate security for overwhelming crime, staff members who did not follow security rules, and staff members who were complicit in the criminal enterprises.

***Inadequate security for overwhelming crime.*** The "first time" that G.M. Primm's supervisor visited Tucker Motel 6, he knew that "security was a problem[.]" Ex. 5 at 107:15-17.[3] G.M. Primm oversaw security at Tucker Motel 6, and she believed there was "absolutely not"

---

[2] Ex. 3 (G.M.'s deposition); Ex. 6 (E.P.'s deposition); Ex. 7 at 96:6-16, 83:16-23 (A.M. Dep.); Exs. 8-12 (declarations from five survivors who engaged in commercial sex acts at the hotel, including A.M.); Exs. 13-15 (declarations from three Vice Unit Officers); Ex. 16 (declaration from former hotel staff). Defendants have moved to strike the officers' eye-witness testimony as improper and belated expert testimony. E.P. has responded. At the Rule 56 stage, the testimony of *any* of these eight witnesses is enough. For example, the G.M.'s testimony alone is enough. Together, the testimony of these eight witnesses (who are the tip of the iceberg) is overwhelming.

[3] G.M. Primm's supervisor was employed by Defendants, too. Ex. 5 at 9:14-23. He supervised G.M. Primm from around 2010 to May 2013. *Id.* at 12:7-20.

enough physical security there.[4] Ex. 3 at 62:21; Ex. 2 at 97:6-7 (G.M. had "primary responsibility" for security), 180:4-10 (G.M. "in charge of the safety and security"). Tucker Motel 6 was "huge," and G.M. Primm thought it needed a daytime officer, and "more than one" officer at night. Ex. 3 at 102:16-21; 21:5-22:8.

G.M. Primm repeatedly asked Defendants for more physical security at Tucker Motel 6 "throughout" her "tenure," including in 2014. *Id.* at 211:14-18, 127:10-18; Ex. 2 at 79:9-10 (corporate approval required), 82:23-83:1. Defendants refused to authorize it. Ex. 3 at 21:15-17, 110:19-24; Ex. 2 at 85:10-14, 88:20-25, 92:12-93:18, 99:11-21; Ex. 5 at 118:1-18. At the same time, Defendants directed G.M. Primm to be the "eyes and ears" and to "always be watching" for criminal activity at the hotel. Ex. 5 at 41:17-23; Ex. 19A 48:20-49:2 (Windes. Dep. Vol. 1).[5]

Without the security needed to address "the extensive crime," G.M. Primm and her team "couldn't monitor everything going on there." Ex. 3 at 23:22-24:7. The "security challenges" "got to be overwhelming." *Id.* at 143:19-22, 142:5-11 ("couldn't battle it all"), 141:15-19 ("it got to be a burden because there was no backup"), 34:11-16 ("so much stuff just slipped by" "you just can't stay on top of" it). It was so out of control that G.M. Primm believed Tucker Motel 6 should be "shut down." *Id.* at 23:22-24:7.

---

[4] In 2014, Tucker Motel 6 had 24 hours per week of coverage from an off-duty DeKalb County Police Department officer. Ex. 2 at 121:19-22:4. In practice, one off-duty officer worked, alone, on certain nights of the week at Tucker Motel 6 for limited hours (Ex. 3 at 14:14, 21:15-16), and the total hours worked per week was 24 hours. Ex. 2 at 121:19-22:4. There was no off-duty officer during the day at Tucker Motel 6. Ex. 3 at 21:12-17. The property also had 22 security cameras (Ex. 3 at 105:20) monitored by an off-site company that purportedly would "call down" from the cameras if there were suspicious activity on the property. Ex. 19B at 23:12-24:9 (Windes Dep. Vol. 2). But the cameras were not effective in monitoring criminal activity, *id.* at 27:23-28:24, and Defendants do not know how often the off-site company was monitoring the property or "calling down," (Ex. 2 at 52:16-53:16), or how many properties the company was monitoring at once, *id.* at 53:17-23.

[5] Foot traffic to a room is "the biggest" sign of commercial sex activity. Ex. 5 at 47:24-48:2, 30:6-21; Ex. 2 at 173:15-20, 63:21-22.

***Staff members who did not follow security rules.*** Making matters worse, Defendants' staff at Tucker Motel 6 did not follow security rules.

Defendants' "security rule" required front desk staff to check ID *before* renting rooms, *before* extending room reservations, and *before* giving out room keys. Ex. 2 at 127:25-128:9, 134:13-17, 135:6-12; Ex. 20 at 75:4-76:3 (Zottl Dep.) "[G]iving out room keys without checking IDs" "absolutely" creates "potential security risks." Ex. 2 at 136:23-137:3.[6] Defendants' policy admonished: "[n]ever give a key to anyone but a registered guest with identification." *Id.* at 134:2-12.

At Tucker Motel 6, these security rules were routinely violated. At the initial check-in stage, Tucker Motel 6 staff regularly failed to record ID information and guests in Defendants' electronic check-in system. Ex. 3 at 73:13-74:3. It was a "common issue" that "there would be people staying at the hotel whose names are not in the registration documents." *Id.* at 74:18-2, 64:2-7 ("always" "more people in a room" than registered in system). Defendants used an electronic check-in system that permitted these security violations—it did not require ID information to be entered at the time of check-in. *Id.* at 84:6-8.

The violations of security rules continued when people came to the front desk to extend room reservations and to get new room keys. In both contexts, there were "issue[s]" with staff failing to check ID. *Id.* at 79:22-80:13.[7]

---

[6] Defendants' 30(b)(6) representative testified that ID may not need to be checked if "you [] know the person." Ex. 2 at 136:23-137:3. Defendants have claimed that E.P. is lying about being trafficked at Tucker Motel 6 and that they did not know her.

[7] A Vice Unit officer testified to his personal knowledge of girls and women staying in rooms that they were not registered to, and staying in rooms with no ID associated. Ex. 21 at 81:25-84:3 (Bess Dep.). A former front-desk clerk who worked under G.M. Primm attested that the staff routinely did not check IDs when checking-in guests because the electronic check-in system did not require it, and G.M. Primm approved it. Ex. 16 at ¶ 12 (A. Jones. Dec.). Setting aside these witnesses, Defendants' G.M. admitted that staff routinely did not check or record ID information.

Because G.M. Primm violated Defendants' policy requiring the G.M. to live on-site, Tucker Motel 6 lacked the "24-hour" "oversight and responsibility" it needed and that Defendants' own policies required. Ex. 2 at 181:19-21.

***Staff members complicit in commercial sex enterprises.*** Also absent from Defendants' motion is the fact that at least some of Defendants' staff were complicit in the booming commercial sex enterprises. "[S]o much stuff just slipped by" the "front desk staff," and they would just "half report stuff." Ex. 3 at 34:14-23. Some would accept drugs or cash from traffickers in exchange for acting as lookouts and sending them buyers. Ex. 7 at 98:1-5, 84:21-24; Ex. 9 at ¶¶ 9-10 (M.S. Dec.). Some had sex with the girls. Ex. 12 at ¶ 4 (J.T.).[8]

## III. Sex Trafficking of 15-year-old E.P. at Tucker Motel 6 in 2014.

E.P., born in September 1998, is from Georgia. Ex. 6 at 15:3-4, 51:25-52:8. Shortly after eighth grade, E.P. began running away from home. *Id.* at 78:22-79:6; 85:19-23. She typically ran away to an apartment rented by an older friend, Deshaun, who had extra space. *Id.* at 85:21-23, 143:17-21, 86:11-15.

### a. E.P. was sex trafficked at Tucker Motel 6 from at least February 2014 – April 2014.

On January 17, 2014, E.P. was 15 years old, and she ran away to Deshaun's apartment.[9] Ex. 6 at 85:21-23, 91:17-19. She stayed until approximately February 10, 2014. *Id.* at 127:9-12. She had "nowhere to go," so she went "across the hall" to an apartment rented by a man named Tight, who she had met through Deshaun. *Id.* at 127:3-8; 151:23-152:3. When E.P. asked Tight

[8] Defendants argue that their security policies and expenditures were robust. Mot. at 9. But written policies were not effective at Tucker Motel 6 because Defendants did not authorize additional off-duty officers needed to monitor and secure the property, Defendants' staff disregarded security rules, and Defendants' staff facilitated criminal enterprises.

[9] E.P.'s mother filed a missing child report, which reports that EP ran away on January 17, 2014. Ex. 22.

for help, he "offered to introduce" her to "Angel, who was staying right up the street at the [Tucker] Motel 6." *Id.* at 126:22-127:8. He did. *Id.*

Angel, a "grown woman," rented a room at Tucker Motel 6 and offered E.P. a place to stay. *Id.* at 161:2-4, 127:25. Angel had sex for money at Tucker Motel 6. *Id.* at 136:21-23. In exchange for giving E.P. a room, Angel made E.P. pay for it. *Id.* at 171:13-18. Angel gave E.P. drugs, *id.* at 92:23-93:4, 93:22-94:5, 94:16-95:1; Ex. 25 at ⁋11, and Angel provided E.P. with "skimpy, scandalous clothes" that were "[s]hort, too tight, lots of cleavage out," *id.* at 169:8-15. The 15-year-old was then openly advertised for sex—she "stood in [the] doorway" of Angel's room and in hallways at Tucker Motel 6 to attract the many men at the hotel interested in buying young girls for sex. *Id.* at 204:9-19; Ex. 25 at ⁋9 (E.P. Dec.). And that open display of illegal commercial sex is what "most of the girls did" at Tucker Motel 6. *Id.* at 204:13-19. E.P. was sold for sex to "at least five men a day" at Tucker Motel 6 to make the money she paid to Angel. *Id.* at 204:15-17; Ex. 25 at ⁋10 ("A lot of days there were more than 10 buyers").

In total, Angel trafficked E.P. from around February 10, 2014 (*i.e.*, when E.P. was brought to Tucker Motel 6 to meet Angel) until approximately March 30 or 31, 2014, Ex. 6 at 129:1-11. Every day that she was with Angel, E.P. was sold for sex to adult men at Tucker Motel 6. *Id.* at 159:24-25, 126:19-127:17.

On March 31, 2014, E.P.'s circumstances at Tucker Motel 6 changed. From around March 16, 2014 to March 31, 2014—when E.P. was living at Tucker Motel 6 with Angel—a 32-year-old man named Chandan Price picked up E.P. on multiple occasions and took her away from the hotel for "a couple hours." *Id.* at 178:21-179:8, 160:1-10, 122:22-23.[10] One such visit occurred on March

[10] E.P. had previously met Chandan at another location after she ran away from home. Ex.6 at 122:9-12, 123:20-24.

31, 2014. *Id.* at 122:22-23. When Chandan brought E.P. back to the hotel that day, she "could not find" Angel. *Id.* at 129:6-8, 122:23-24. "So that's when [Chandan] convinced me to let him get the room for me." *Id.* at 122:24-25.

As Defendants' own room records show, Chandan Price rented a room at Tucker Motel 6 from March 31, 2014 – April 3, 2014. Exs. 24A and B (room record); Ex. 4 at 77:11-16. During that time, he sold the 15-year-old E.P. at Tucker Motel 6. Ex. 6 at 125:10-15, 122:25-126:1. After April 3, he continued to traffic E.P. for weeks at Tucker Motel 6 under a different name. *Id.* at 161:1, 161:14-24.[11]

Chandan worked with another trafficker, Black, at Tucker Motel 6 to traffic E.P. Ex. 6 at 122:4-5; Ex. 25 at ¶¶ 9, 10, 14 (E.P. Dec.). Chandan paid Black for use of a room at Tucker Motel 6 to sell E.P. for sex to interested buyers. Ex. 6 at 122:4-5. Chandan talked to Black in hotel common areas when E.P. talked to AM, a woman trafficked by Black at Tucker Motel 6. Ex. 25 at ¶ 14. Chandan's permissiveness in E.P.'s dealings with AM was unusual, because "it would make Chandan mad" if E.P. were too friendly with other people. Ex. 6 at 172:9-12, 174:19-23. Several times, A.M. handled sessions with sex buyers at Black's approval so that E.P. did not have to. Ex. 7 at 65:1-7. At one point, Black called to warn Chandan of police activity on the property. Ex. 6 at 175:9-10. Tucker Motel 6 staff served as lookouts for Black and sent sex buyers to him to facilitate his sex trafficking business at Tucker Motel 6. Ex. 7 at 98:1-5, 84:21-85:7, 93:3-17, 91:14-92:5, 94:9-95:15.

[11] In her deposition, Defendants asked E.P., "why [Chandan] checked in with his name on March 31st of 2014," and E.P. answered, in part, "[m]aybe because it was a last-minute thing and he didn't expect to do it. Because like I said, we came back to the hotel and Angel was just gone." Ex. 6 at 161:25-162:5. With staff "issues" checking and recording ID, and an electronic system that did not require ID information to be recorded, Chandan could readily check in under another name or through another person. Indeed, there is evidence that he did. Ex. 6 at 122:4-5, 160:24-161:24.

Chandan and E.P. were "always together" at Tucker Motel 6, including in common areas. Ex. 7 at 58:23, 59:1; Ex. 6 at 176:5-9; Ex. 25 at ¶¶ 12-13. Chandan gave E.P. marijuana, cocaine, and ecstasy. Ex. 6 at 92:23-93:4, 93:22-95:1. He "provided" and "bought" provocative clothes for E.P. *Id*. at 169:8-13. Like with Angel, E.P. attracted sex buyers by loitering in the doorway and in common areas, *id.* at 204:12-18, Ex. 25 at ⁋9, and she saw "at least five men a day" at Tucker Motel 6. Ex. 6 at 204:15-17; Ex. 25 at ⁋10. Chandan took the money. Ex. 6 at 171:13-24.[12]

At some point, in approximately late April or early May 2014, Chandan took E.P. to Orlando, Florida, where he trafficked her in multiple hotels. Ex. 6 at 180:14-20, 183:12-15. On June 3, 2014, the Orlando Police Department recovered E.P. Ex. 22.[13]

**b. Police Visit Tucker Motel 6 with a Flyer about E.P., a Missing Child.**

After E.P. ran away on January 17, 2014, her mother reported her as a missing child and signed an affidavit submitted to the Juvenile Court of Gwinnett County. Ex. 22. The Gwinnett County Juvenile Court issued a warrant "to take into custody said child." *Id.*

During the time that E.P. was trafficked at Tucker Motel 6, the police "came around the hotel with her picture." Ex. 7 at 62:13-64:18, 67:15-16. The notice stated that E.P. was a "missing child or runaway or something like that." *Id.* at 75:11-17. The police went into the Tucker Motel 6 office with the same notice. *Id.* at 70:22-24, 74:12-22. After the police came to Tucker Motel 6, E.P. and Chandan learned of the visit. Ex. 25 at ¶ 17. Chandan continued to traffic her there after the police visit. *Id.*

---

[12] Both Chandan and Angel switched rooms at Tucker Motel 6 multiple times, and they went to the front desk to do so. Ex. 25 at ⁋⁋5-6.

[13] G.M. Primm claimed not to recognize E.P. and expressed surprise that a young White girl was trafficked at the hotel because most of the exploited children were Black. A.M. is White, too. Regardless, G.M. Primm lived off property in 2014, and was "distracted" and not regularly available because her husband was hospitalized. Ex. 5 at 110:14; Ex. 3 at 140:23-141:1.

**c. E.P.'s interactions with Tucker Motel 6 staff.**

On an "almost daily basis," E.P. went to the front desk to get new key cards. Ex. 6 at 163:16-21. She made these "almost daily" front-desk visits the "whole time" that she was at Tucker Motel 6, which was at least February 2014 – April 2014. Id. at 163:23, 163:24-25. "[A]ll they really would ask me is the room number. And they would give me a key card to it." *Id.* at 163:3-5. They did not ask for her ID. *Id.* at 162:6-24. E.P. was then trafficked in the rooms. *Id.* at 204:11-19.

When she was trafficked by Chandan, E.P. went to the front desk to extend a room rental under Chandan's name for another night. *Id.* at 162:15-24. "[W]hen it was time to pay for the hotel that day, he wasn't there and he asked me to go down there." *Id.* at. 162:15-17. Chandan instructed E.P. to "tell them your boyfriend is at work and that, you know, you're not going to have anywhere to go, and he won't be off until like 12:00 tonight." *Id.* at 162:18-21. "They never asked me for ID. They never verified how old I was. They just let me pay for the room and continued it in his name." *Id.* at 162:22-24.

To attract sex buyers, E.P. stood in common areas scantily clad. *Id.* at 169:8-13; Ex. 25 at ¶¶9-10. She "exchanged towels out multiple times a day" with housekeeping. Ex. 6 at 167:4-5. "Each time" a "man came" to buy sex from E.P. at Tucker Motel 6, "I would leave him in the room, walk downstairs, get the condom [from Tucker Motel 6's vending machine], go back upstairs. And I did that multiple times a day." *Id.* at 171:11-172:6.

**IV. <u>E.P.'s Trauma as a Result of Being Sex Trafficked at Tucker Motel 6.</u>**

As result of her trafficking at the Tucker Motel 6, E.P. has suffered, and continues to suffer, significant emotional harm, psychological harm, and mental anguish. E.P.'s testimony establishes as much. Further, testimony from Defendants' expert, Dr. Norman, confirms that the cause of E.P.'s trauma is a question for a "factfinder," even if he cannot resolve it as a clinician.

**a. E.P.'s testimony.**

Tucker Motel 6 "was the first hotel that [E.P.] was trafficked at," and "[i]t is very significant to [her] and [her] trauma because of that." Ex. 6 at 118:15-17. In her deposition, she testified to the many "ways" that she "believe[s] the G6 Defendants have harmed [her]." *Id.* at 203:18-204:6.

> **Q**. [W]hat are the ways in which you personally believe the G6 Defendants have harmed you?
> **A**. I've suffered a lot of emotional trauma. I have PTSD. I have anxiety. I have depression. I suffer from depression. It's hurt me a lot. And like my relationships in life with family, friends, boyfriends, I always think somebody wants something from me or they're not really for me. I have a lot of problems with my teeth from cocaine usage, from being introduced to cocaine by Chandan. Sex, to me, is just kind of, you know – it doesn't mean anything, and it should. There's a lot of ways that it has affected my life and continues to affect my life till this day.

*Id.*[14] Elsewhere: "Q. [] What mental anguish and emotional stress do you believe the G6 Defendants caused? A. I have PTSD from that. I have anxiety. I've become depressed over it." *Id.* at 207:1-4. Later, she testified that she suffers from "nightmares and flashbacks," *Id.* at 214:9-16 (up to "once a week"), and "panic attacks," *Id.* at 222:25-223:4.

Though E.P. testified to a long list of "ways" that Defendants "harmed" her—anxiety, depression, PTSD, nightmares, flashbacks, panic attacks, relationship strain, trust issues, and sexual dysfunction—Defendants' counsel never asked E.P. basic questions about the link between those harms and Defendants. E.P.'s declaration at ¶¶ 19-27 establishes those links, which are matters of common sense, anyway. As E.P. attests, "I have memories of sexual assaults and rapes

[14] Defendants' failure to even cite this testimony, driven by an effort to construe partial facts in the light most harmful to E.P., is a textbook violation of the Rule 56 standard. It is the opposite of what the law requires at summary judgment. Defendants' suggestion that the sum of the harm that E.P. suffered from months of child sex trafficking at Tucker Motel 6 is tooth damage from cocaine use is as wrong as it is offensive. Mot. at 17. E.P. was testifying in that context to physical injuries. As demonstrated above, E.P. testified extensively about emotional harm, psychological harm, and mental anguish she experiences because she was trafficked for months as a 15-year-old at Tucker Motel 6.

at Tucker Motel 6 that I cannot get rid of that pop into my head at random times in the day and night on a regular basis." Ex. 25 at ¶ 19. E.P. further attests that she has "experienced" and "still experience[s]" nightmares and flashbacks about sexual assaults and rapes at Tucker Motel 6. *Id.* at ¶ 20. She also attests that she has "experienced" and "still experience[s]" panic attacks, anxiety, depression, and insomnia when she "think[s] about sexual assaults and rapes at Tucker Motel 6." *Id*. at ¶¶ 21, 22, 23. In addition, E.P. attests that the "nightmares, panic attacks, insomnia, anxiety, and depression that I have experienced from thinking about sexual assaults and rapes at Tucker Motel 6 have made it difficult for me to perform work responsibilities and to hold a job for a long period." *Id.* at 25. Further, E.P. attests that when she "think[s] about sexual assaults and rapes at Tucker Motel 6, it hurts me a lot. It causes me to doubt relationships with men, and to believe that men always want something from me and are not really for me." *Id.* at 26. Finally, E.P. attests that, "[a]fter having sex for money with dozens and dozens and dozens of men at Tucker Motel 6 who assaulted and raped me, sex does not mean anything to me." *Id.* at 27.

In sum, E.P.'s deposition testimony, and her declaration, establish that E.P. has experienced, and continues to experience, significant emotional harm, psychological harm, and mental anguish as a result of being sexually assaulted and raped hundreds of times as a 15-year-old at Tucker Motel 6. At a minimum, her sworn statements at least lead to a reasonable inference that she has suffered and is suffering from a litany of harms because she was trafficked at Tucker Motel 6.[15]

[15] Defendants argue that E.P.'s self-reports in medical records establish that she has not been harmed by being sexually assaulted and raped hundreds of times at Tucker Motel 6. As E.P. repeatedly testified, she did not disclose all (and in some cases, any) of her emotional, psychological, and mental challenges because she was afraid of losing custody of her son if she spoke openly. Ex. 6 at 218:12-16. Further, Dr. Norman reported that there are legitimate reasons for child sex trafficking victims to protect and fear their traffickers, and to minimize or omit details about their trafficking in reports. Ex. 26 at 106:19-107:25 (Norman Dep.).

**b. Dr. Norman's Report and Testimony.**

Dr. Norman's report and testimony confirms that E.P. is not malingering or feigning, that she is experiencing real trauma symptoms consistent with PTSD, among other clinical diagnoses, and that it is for a factfinder to determine what role Tucker Motel 6 has played in her trauma symptoms.

Defendants retained Matthew W. Norman, M.D., a board-certified forensic psychiatrist, to conduct an independent medical examination (IME) of E.P. and to render opinions concerning her psychiatric condition and its cause. Ex. 26 at 54:11-16. Dr. Norman conducted that examination on January 14, 2026, and issued his written report on February 1, 2026. *Id.* at 15:22-24; 97:18-20. In the course of his examination, Dr. Norman administered four psychometric test to E.P.: (1) the Personality Assessment Inventory ("PAI"); (2) the Inventory of Problems-29 ("IOP-29"); (3) the Life Events Checklist for DSM-5 ("LEC-5"); and (4) the Clinician-Administered PTSD Scale for DSM-5 ("CAPS-5"). *Id.* at. 10:19-24. He also conducted a multi-hour clinical interview of E.P. and reviewed her medical records and other records. *Id.* at 87:21-23.

After his clinical assessment of E.P., Dr. Norman did ***not*** diagnose her with malingering. *Id.* at 19:1-13 (test results "rule[d] out malingering."); 40:15-23; 87:4-7. He also did ***not*** diagnose her with feigning. Id. at 18:21-19:4.

In his report, and in his deposition, Dr. Norman confirmed that E.P. "reports a constellation of symptoms consistent with posttraumatic stress disorder, PTSD, major depressive disorder, and generalized anxiety disorder." Ex. 26 at 41:9-13; Ex. 27 at ¶ 17 (Norman Report).[16]

---

[16] He testified that based on her self-reporting during the examination and the results of the CAPS-5, E.P. describes symptoms that meet the subjective criteria for PTSD. Ex. 26 at 71:24-72-4. Indeed, he walked through each of the eight DSM-5 criteria for PTSD and confirmed that E.P. meets seven out of the eight criterion for PTSD. *Id.* at 58:22-23, 59:12-16, 60:2-7, 60:13-18, 62:1-5, 66:3-7, 71:10-13. As to the Criterion H, E.P. never told Dr. Norman that her daily cannabis use was causing her irritability, insomnia, or anxiety. *Id.* at 70:24-25, 71:1-2, 71:4. Dr. Norman

Although Dr. Norman declined to render a scientific opinion specifically "apportioning" causation among E.P.'s trafficking at Tucker Motel 6 and other traumatic events in her life, he agreed that "a factfinder may be able to do that"—*i.e.*, determine whether E.P.'s "symptoms" were "caused" (in whole or in part) by her trafficking at Tucker Motel 6. Ex. 26 at 86:17-87:2, 87:8-16. Similarly, he emphasized that, "each trauma is independently sufficient to potentially cause" E.P.'s symptoms, and that the traumas at Tucker Motel 6 are among them. *Id.* at 72:14-15, 85:6-15.

In addition to his specific opinions concerning E.P., Dr. Norman confirmed that: (i) child sex trafficking usually affects child victims of child sex trafficking, (*id.* at 103:1-9); (ii) child sex trafficking can affect the psychological development of child victims, (*id.* at 104:1-6); (iii) child sex trafficking can cause victims to suffer psychological harms, (*id.* at 106:2-1); (iv) healing from trauma is a process that is individualized, may take significant time, and for some individuals may "never fully resolve," (*id.* at 108:1-16); and (v) a person may suffer emotional harm without being diagnosed with a psychiatric condition, (*id.* at 56:16-20; 109:6-13; 111:21-112:1).

## STATEMENT OF THE ISSUES

As shown herein, there are material disputed facts as to each of the three issues identified by Defendants.

## LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657

concluded that based on her CAPS-5 results, E.P. has "the presence of posttraumatic stress disorder with a moderate burden or moderate severity." *Id.* at 31:23-32:2, 96:20-23.

(2014) (*per curiam*). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255; *Liberty Ins. Corp. v. Dixie Elec., L.L.C.*, 637 F. App'x 113, 116 (5th Cir. 2015).

## ARGUMENT

The Court should deny Defendants' motion for summary judgment as to causation and punitive damages because there are material disputed facts on both issues. As to causation, a reasonable jury could conclude that E.P.'s detailed testimony about her trafficking at Tucker Motel 6 as a 15-year-old, and the harms that she suffered as a result, establish "but for" causation. The evidence further supports a jury finding that E.P.'s injuries were a reasonably foreseeable result of Defendants' practices at Tucker Motel 6, a property with a commercial sex crime "problem," that facilitated E.P.'s trafficking.

E.P. has also presented substantial record evidence that justifies punitive damages in this case. Defendants disregard extensive case law holding that the TVPRA permits punitive damages and that a corporation may be liable for punitive damages based on the reckless indifference of its managers and employees.

### I. Summary judgment is not proper as to causation because of material disputed facts.

Summary judgment is improper as to causation because of material disputed facts. Indeed, E.P.'s personal knowledge testimony and lay opinion testimony under Rules 601 and 701 about her common and ordinary conditions (anxiety, depression, panic attacks, nightmares, flashbacks, insomnia, sexual dysfunction) is sufficient under federal and Texas law to prove causation for compensatory damages.

**a. Under binding authority, direct and circumstantial evidence from fact and lay witnesses is sufficient to prove causation as to compensatory damages.**

E.P. agrees with Defendants that causation (but-for and proximate) is an element of E.P.'s claims.[17] Yet Defendants omit critical rules relevant to causation here, namely Rule 601, which permits everyone, including E.P., to testify to facts within their personal knowledge, and Rule 701, which permits everyone, including E.P., to testify to common-sense opinions based on their rational perceptions. Defendants likewise ignore key legal principles in binding case law, including that lay testimony may be used to prove that an incident caused compensatory damages (expert testimony is not required) and that causation is generally a fact issue for the jury to resolve based on reasonable inferences drawn from direct and circumstantial evidence.

***Rule 601 fact testimony***. Under Rule 701, E.P. may testify to facts relating to her damages, symptoms, experiences, and challenges after being sex trafficked at Defendants' hotel. "All witnesses may testify to facts within their personal knowledge." *United States v. Chavez-Lopez*, 767 F. App'x 431, 433 (4th Cir. 2019); Fed. R. Evid. 601 ("Every person is competent to be a

[17] E.P. does not concede that Defendants have properly represented and characterized the cases they cite in support of their argument. Mot. at 14-17. For example, E.P. does not agree with Defendants' statement in a footnote that "any damages would need to be apportioned" at trial. Mot. at 15. The cases that Defendants cite do not say that, and courts nationwide have found otherwise. Indeed, every court to have examined the issue has found that the TVPRA requires joint and several liability. *See Doe (K.E.C.) v. G6 Hosp., LLC, et al.*, No. 1:23-cv-270 (E.D. Tex. June 16, 2025) (analyzing the other cases in the country addressing the issue); *W.K. v. Red Roof Inns, Inc.*, No. 1:20-cv-5263, 2024 WL 2892322, at *2 (N.D. Ga. June 10, 2024) (Calvert, J.) ("Damages under the TVPRA are joint and several." (bold omitted)); *K.M. v. Reva Properties, LLC*, No. 1:22-cv-3991, 2024 WL 1217420, at *2 (Thrash, J.) (noting, without deciding, that it would be "surprising that Congress intended to permit apportionment without saying so since it was foreseeable that others would be involved in these claims and since allowing civil beneficiary defendants to apportion fault to traffickers, individuals who sexually assault victims, and other beneficiaries would drastically undermine the effect of the civil beneficiary provision."); *Ditullio v. Boehm*, No. 3:09-cv-113, 2010 WL 11534265, *4 (D. Alaska Feb. 23, 2010) (agreeing that the TVPRA's civil remedy section "does not provide for the application of state law, and therefore state apportionment rules do not apply."). But, relevant here, E.P. does not dispute the basic proposition that but-for and proximate cause are an element of her claims.

witness unless these rules provide otherwise."); Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."). This rule has broad applications to a patient's medical history, symptoms, and conditions. For example, the Fifth Circuit has applied it to, "[a] patient's drug history, what a patient told medical personnel, and the diagnosis a patient has received." *United States v. Sanjar*, 876 F.3d 725, 738 (5th Cir. 2017). So too here.

***Rule 701 lay opinion testimony.*** Under Rule 701, E.P. may provide opinions "rationally based on [] [her] perception[s]" of her damages, symptoms, experiences, and challenges after being sex trafficked at Defendants' hotel. Fed. R. Evid. 701; *see also United States v. Jackson*, 549 F.3d 963, 975 (5th Cir. 2008) (finding that Rule 701 allows lay opinions based on "common sense"). For example, in *Sanjar*, the Fifth Circuit held that the district court properly admitted Rule 701 testimony from patients about "the severity" of their "mental condition[s]," including "a patient's recollection that [the patient] was not experiencing visual or auditory hallucinations upon admission," "was similarly not suffering acute psychotic symptoms," and "was not feeling badly enough to label [the patient's] depression major." *Sanjar*, 876 F.3d at 738. According to the Court, "[e]ach patient spoke only to his or her condition," and the "testimony assisted the jury." *Id.* "Even if the statements implicate specialized knowledge," it fell under Rule 701 testimony because the "specialized knowledge" was "informed by the patient's experience—*they are the ones living with the mental illnesses*." *Id.* (emphasis added). Other courts have affirmed that, under Rule 701, lay people may opine about their symptoms so long as they are using their rational perceptions and "common sense." *See, e.g., Osterhout v. Bd. of Cnty. Commissioners of LeFlore Cnty., Oklahoma*, 10 F.4th 978, 997 (10th Cir. 2021) (plaintiff could talk about how attack "connect[ed]" to his "later

depression and anxiety"; "[l]aypersons could easily see the connection without the aid of expert testimony"); *In re Mosley*, 494 F.3d 1320, 1326 (11th Cir. 2007) (allowing testimony "from personal knowledge about… struggles with depression"); *Tindall v. H & S Homes, LLC*, No. 5:10-cv-44, 2011 WL 5007827, at *6 (M.D. Ga. Oct. 20, 2011) ("Plaintiff may testify as to her own mental suffering and her lay opinion as to its cause") (citing Fed. R. Evid. 701); *Scafidi v. B. Braun Medical, Inc.*, No. 8:22-cv-2772, 2024 WL 382397, at *4 (M.D. Fla. Feb. 1, 2024) (Plaintiff "may testify about any emotional anguish, anxiety, and depression she experienced"); *Gomez v. Palmer*, No. 11 C 1793, 2016 WL 212800, at *8 (N.D. Ill. Jan. 19, 2016) (plaintiff may testify to his belief that he was developing an infection at wound site because "whether a wound is infected is within the ordinary experience of the average person"); *EEOC v. AutoZone Inc.*, 631 F. Supp. 2d 1076, 1080 (C.D. Ill. 2009), *rev'd in part sub nom. E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635 (7th Cir. 2010) (Rule 701 permitted patient's testimony "rationally based on his own perceptions" related to "symptoms, pain and treatment").

***Lay testimony may be used to prove compensatory damages (expert testimony not required).*** "Under Texas law, lay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004) (citation and quotations omitted). "Generally, lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation." *Id.* (citation omitted). "[I]n determining whether lay testimony is sufficient to prove causation, Texas courts look at the nature of the lay testimony and the nature of the injury." *Id.*.

There is no reason to believe the rule would be any different under the TVPRA. *See, e.g., Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 109–10, 80 S. Ct. 173, 175–76, 4 L. Ed. 2d 142 (1959) (reversing Fifth Circuit in Jones Act case and finding that the jury had the "power to draw the inference that the aggravation of petitioner's tubercular condition" "was in fact caused by [the] accident" even though no "medical witness" testified that "it was in fact the cause"); *DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) ("corroborating testimony and medical evidence is not required in every case [under Section 1981 and 1983] involving compensatory damages"); *Lindsley v. TRT Holdings Inc.*, No. 3:17-CV-2942-X, 2023 WL 11983791, at *7 (N.D. Tex. Mar. 6, 2023) (holding in employment discrimination case that, "corroborating testimony and medical evidence is not required in every case involving compensatory damages" for "emotional distress and other intangible injuries.") (citation and quotations omitted); *Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062, 1066 (5th Cir. 2016) ("During trial, Pineda testified [in FLSA case] to experiencing marital discord, sleepless nights, and anxiety about where his family would live after JTCH made what the jury found to be a retaliatory demand for back rent. Such testimony is sufficient to enable a jury to find that the plaintiff experienced compensable emotional distress.").

As the above case law establishes, Defendants overstate the law in arguing that where a "plaintiff alleges unobservable injuries—such as PTSD, anxiety, and depression—she must generally 'provide admissible expert causation evidence." Mot. at 16.[18] Not so. Both Texas and federal law permit witnesses to testify under Rules 601 and 701 to their symptoms and conditions,

[18] Defendants' Motion for Summary Judgment as to Causation and Punitive Damages is referred to throughout as "Mot." Page numbers are those stamped by CM-ECF in the top of the filing

and lay testimony is sufficient under both Texas and federal law to prove causation when the causation testimony is based on "common sense."

Both *Sanchez* and *McNabney* (Mot. at 16) concern causation of conditions that are "neither common nor basic," like "ligament sprain of the thoracic spine and lumbar spine, back spasms, [and] lumbar radiculopathy" in *Sanchez*, 2020 WL 7349094 at *3, and "reflex sympathetic dystrophy" in *McNabney*, 153 F. App'x 293, 294. By contrast, this case involves testimony about flashbacks, nightmares, anxiety, depression, insomnia, and panic attacks, which are "common" and "basic" conditions that ordinary people understand. *Hamburger*, 361 F.3d 875 ("lay testimony is adequate to prove causation" where "general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition").

*Wuntstell* (Mot. at 16) is a toxic-exposure case where the plaintiff had to prove "both general and specific" causation using expert testimony. *Wunstell v. BP, P.L.C.*, 2024 WL 4100496, at *4 (5th Cir. Sept. 6, 2024). The plaintiff in *Wuntstell* failed to provide the required expert testimony to prove that his "contact with smoke and chemicals" caused his "emotional injuries." *Id.* at *4. *Wuntstell* does not apply here, because, unlike toxic tort claims, trafficking claims under Texas law and the TVPRA do not require expert testimony to prove causation.

***Causation is generally a fact issue for the jury based on direct and circumstantial evidence.*** "Under Texas law, causation generally is a question of fact for the jury." *Flock v. Scripto–Tokai Corp.,* 319 F.3d 231, 237 (5th Cir.2003). Causation "need not be supported by direct evidence." *Tompkins v. Cyr,* 202 F.3d 770, 782 (5th Cir.2000). "Circumstantial evidence and reasonable inferences therefrom may form a sufficient basis for a finding of causation." *Id.* "The jury has broad latitude to infer proximate cause from the evidence and circumstances surrounding

FILED UNDER SEAL

an [incident]." *J.K. and Susie L. Wadley Research Inst. and Blood Bank v. Beeson*, 835 S.W.2d 689, 698 (Tex.App.—Dallas 1992, *writ denied*). Even complex causation questions are for the jury. *Poincon v. Offshore Marine Contractors, Inc.*, 9 F.4th 289, 298 (5th Cir. 2021) ("The potential complexity of Offshore Marine's case for causation simply provides no basis for taking that fact question away from the jury."); *United Gas Pub. Serv. Co. v. Texas*, 303 U.S. 123, 140, 58 S.Ct. 483, 82 L.Ed. 702 (1938) ("[W]e have never held that it is beyond the power of the state to provide for the trial by a jury of questions of fact because they are complicated.")[19]

These rules and principles, which are omitted from Defendants' brief, show why Defendants' motion should be denied.

**b. E.P.'s fact and lay opinion testimony creates a material disputed fact as to whether Defendants caused E.P.'s compensatory damages.**

E.P.'s testimony about the emotional, psychological, and mental harms that she has suffered create a material disputed fact as to whether Defendants caused E.P.'s compensatory damages.

***But-for causation.*** The but-for "standard requires the plaintiff to show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338, 346-347 (2013) (citation omitted).

[19] Again, there is no reason to think the law is different for E.P.'s TVPRA claim. The Fifth Circuit's pattern instructions direct jurors to consider both direct and circumstantial evidence. Pattern Civ. Jury Instr. 5th Cir. 3.3 (2024) ("As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.") It also instructs jurors to draw "any fair inferences and reasonable conclusions" from the "facts and circumstances that have been proven. *Id.*; *see also Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107, 109–10, 80 S. Ct. 173, 175–76, 4 L. Ed. 2d 142 (1959) (reversing Fifth Circuit and finding that the jury had the "power to draw the inference" of the cause of Plaintiff's medical condition).

Here, E.P. testified in detail about her trafficking at Tucker Motel 6, how Defendants' staff at the hotel furthered and facilitated her exploitation, and the various "harms" she would not have suffered "but for" being trafficked there. *See, e.g.,* Ex. 6 at 118:15-17 (Tucker Motel 6 is "very significant" to her trauma because it was the first hotel she was trafficked at); *Id.* at 203:18-204:6 (trafficking at Tucker Motel 6 caused her emotional trauma, PTSD, anxiety, and depression; damaged relationships with family, friends, and boyfriends); *Id.* at 207:1-4 (PTSD, anxiety, depression); *Id.* at 214:9-16 (nightmares and flashbacks); *Id.* at 222:25-223:4 (panic attacks). Dr. Norman did not diagnose E.P. with feigning or malingering. Ex. 26 at 19:1-13, 40:15-23, 87:4-7, 18:21-19:4.

E.P.'s deposition testimony about her symptoms is based on her personal knowledge of her body, which is permitted fact testimony (under Rule 601), and lay opinion testimony (under Rule 701), about common symptoms she is "living with." *Sanjar*, 876 F.3d at 738 (permitting lay opinion testimony on symptoms that patients are "living with").

Contrary to Defendants' argument, E.P. does not need to call an expert to opine that because she was sexually assaulted and raped as a child hundreds of times at Tucker Motel 6, she suffers from depression, anxiety, nightmares, flashbacks, and panic attacks. Indeed, E.P.'s opinion on that topic is "common sense" under Rule 701, *Jackson*, 549 F.3d at 975, and it concerns common symptoms and conditions that do not require complex medical testimony to understand. *See Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004) ("Under Texas law, lay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition."); *see also Sanjar*, 876 F.3d at 738 ("even if" Rule 701 testimony "requires some specialized knowledge, it is admissible so long as the lay

witness offers straightforward conclusions from observations informed by his or her experience."). *At a minimum*, E.P.'s deposition testimony amounts to circumstantial evidence that gives rise to a reasonable inference that she has suffered and will suffer the symptoms that she has testified to (e.g., depression, anxiety, nightmares, flashbacks, and panic attacks) because of being sex trafficked at Tucker Motel 6. Because causation "is generally a jury question," and there is evidence of but-for causation here, there is no basis to find otherwise as a matter of law.

Even if E.P.'s deposition testimony were not clear enough to create a material dispute of fact (it is), E.P.'s declaration establishes links between her symptoms and Tucker Motel 6 that Defendants' counsel left unexamined in E.P.'s deposition. As E.P. attests, "I have memories of sexual assaults and rapes at Tucker Motel 6 that I cannot get rid of that pop into my head at random times in the day and night on a regular basis." Ex. 25 at ¶ 19. E.P. further attests that she has "experienced" and "still experience[s]" nightmares, flashbacks, panic attacks, anxiety, depression and insomnia when she thinks about sexual assaults and rapes at Tucker Motel 6. *Id.* at ¶¶ 20-24. Those assertions eliminate any doubt that there is a material dispute of fact as to but-for causation. Certainly, based on the record here, a reasonable juror could conclude that E.P.'s trafficking at Tucker Motel 6 as a 15-year-old for at least two months was the but-for cause of E.P.'s nightmares, flashbacks, panic attacks, anxiety, depression and insomnia, as she has testified and declared.

Defendants cite *Anthony*, a criminal TPVRA restitution case arising under 18 U.S.C. § 1593, to argue that E.P. can only prove but-for causation here if she separates trauma from Tucker Motel 6 from other traumas in her life. Mot. at 15. Even if that were the law (it is not),[20] E.P.'s

---

[20] That burden belongs to Defendants, not Plaintiff. *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 614–15 (2009) (noting it is the *defendants'* burden to prove a "reasonable basis for apportionment exists."). Defendants would like to reverse the burden of proof because Defendants have put forth no evidence to show that a reasonable basis for apportionment exists. Defendants' own expert agrees. Because Defendants make no argument to carry their burden on

deposition and declaration do that—*i.e.*, they specifically address that but for her victimization at Tucker Motel 6, she would not experience the specific harms that she suffers from. Anyway, *Anthony* does not support Defendants' argument. In *Anthony*, the Court held that the government failed to prove but-for causation because it did not prove that the victim's specific losses (lifetime therapy, medication, tutoring, lost wages) would have occurred but-for the defendant's conduct as distinct from that of other abusers. In particular, the Court found that the government's expert failed to apportion which of the victim's losses were attributable to defendant as opposed to other perpetrators. This was critical, because the criminal penalty imposed must be "for losses actually resulting from the offense of conviction," and the dollar amount must be "rooted in a calculation of actual loss." *Id*. at 950, 953. The TVPRA and civil law under *Burlington* provides for the opposite: joint and several liability.[21]

---

apportionment, Defendants have waived that argument here. *Allen v. Hays*, 65 F.4th 736, 746 (5th Cir. 2023) ("[A]n argument cannot be raised for the first time in a reply brief, so it is waived.").

[21] Defendants' argument regarding but-for causation is completely inconsistent with their argument that damages should be apportioned. If Defendants are correct that but-for causation applies to the TVPRA because "federal tort" law "adopts the background of general tort law," Mot. at 10, then Defendants must also admit that the TVPRA requires joint and several liability *for the exact same reason.* It is precisely *because* federal tort law adopts the background of general tort law that every court to address that question—including this Court, in a case with these Defendants—has found joint and several liability applies. *Doe v. Wyndham Hotels & Resorts, Inc.*, 25-CV-1550 (KSH) (JBC), 2026 WL 878295, at *8 (D.N.J. Mar. 30, 2026) ("the TVPRA allows for joint and several liability"); Ex. 28, *Doe (K.E.C.) v. G6 Hosp., LLC, et al.*, No. 1:23-cv-270 (E.D. Tex. June 16, 2025) (Truncale, J.) (denying apportionment request in TVPRA case, noting, "[t]he Alaska and Georgia district courts got the law right[.]"); *K.M. v. Reva Properties, LLC*, No. 1:22-cv-3991, 2024 WL 1217420, at *2 (noting, without deciding, that it would be "surprising that Congress intended to permit apportionment without saying so since it was foreseeable that others would be involved in these claims and since allowing civil beneficiary defendants to apportion fault to traffickers, individuals who sexually assault victims, and other beneficiaries would drastically undermine the effect of the civil beneficiary provision."); *W.K. v. Red Roof Inns, Inc.*, 1:20-CV-05263-VMC, 2024 WL 2892322, at *2 (N.D. Ga. June 10, 2024) ("joint and several liability is the traditional rule for federal torts, so the TVPRA is properly understood to follow this rule absent language to the contrary."); *Ditullio v. Boehm*, No. 3:09-cv-113, 2010 WL 11534265, *4 (D. Alaska Feb. 23, 2010) (TVPRA's civil remedy section "does not provide for the application of state law, and therefore state apportionment rules do not apply.").

Therefore, there is a material dispute of fact as to but-for causation.

***Proximate causation.*** The record also shows that the harms E.P. has suffered as a result of being sex trafficked at Tucker Motel 6 were a reasonably foreseeable consequence of Defendants' conduct.

*First*, Tucker Motel 6 was a hub for rampant commercial sex crimes for years, yet Defendants continued operating the property. Indeed, G.M. Primm testified that the property had a "problem" with commercial sex crimes, that it was a "busy" place for commercial sex, that she observed "a lot" of men going "in and out, in and out, in and out" of rooms, that she "couldn't put a number" on how many women (over 18) and girls (under 18) were sold for sex at Tucker Motel 6 (but she "know[s]" that she "s[aw] quite a bit"), and that commercial sex crimes occurred at Tucker Motel 6 during "all times of day," on "all parts of the property," in "multiple rooms on the property." Ex. 3 at 91:16-20, 17:15-25, 86:15-87:11, 142:24-25. At least seven other witnesses confirmed G.M. Primm's testimony, and guests regularly complained about the "rough" and "intense" environment, excessive foot traffic, and people lingering around the property, (Ex. 3 at 13:2, 142:23, 117:22-118:3; Ex. 5 at 19:16), all of which Defendants recognized as indicators of commercial sex activity, (Ex. 5 at 47:24-48:2, 30:6-21; Ex. 2 at 173:15-20, 63:21-22).

*Second*, the record shows that Defendants' practices facilitated the commercial sex crimes. Despite G.M. Primm's repeated requests for more security, Defendants refused to provide it. Ex. 3 at 21:15-17, 110:19-24, 211:14-18, 127:10-18; Ex. 2 at 79:9-10, 82:23-83:1, 85:10-14, 88:20-25, 92:12-93:18, 99:11-21; Ex. 5 at 118:1-18. So, she moved out due to "safety" concerns, even though she was required to live there, and her staff was left "overwhelmed" with the crime. Ex. 3 at 18:4-13, 23:22-24:7, 143:19-22, 142:5-11, 141:15-19, 34:11-16; Ex. 2 at 181:3-25, 184:11-13. Defendants required staff to monitor the property for obvious indicators of commercial sex activity

but the staff "couldn't monitor everything going on" at the property." Ex. 5 at 41:17-23; Ex. 19A at 48:21-49:2; Ex. 3 at 23:22-24:7. In addition, the staff's disregard of security rules relating to checking identification before giving room keys, (Ex. 3 at 73:13-74:3, 74:18-2, 64:2-7, 84:6-8), and complicity in the criminal enterprises on the property, facilitated the continuing commercial sex crimes year after year, Ex. 8 at ¶¶ 7-9.

*Third*, the record shows that Defendants' staff repeatedly encountered E.P. in common areas, at the front desk, and in her rooms. They ignored basic security rules by giving her room keys "almost daily" without asking her for identification, and they rented a room to her without asking her for identification. She often stood in common areas with provocative clothing to attract buyers, exchanged towels with housekeeping multiple times daily, and repeatedly walked through the property to purchase condoms from the hotel vending machine before commercial sex acts. Ex. 6 at 169:8-13, 167:4-5, 171:11-172:6. E.P. was trafficked at Tucker Motel 6 even after the police came to the property with a notice identifying her as a missing child. Ex. 25 at ¶ 17.

For these reasons, a reasonable jury could find that the evidence proves that the harms that E.P. has suffered were a foreseeable consequence of Defendants conduct, and therefore, summary judgment is improper as to both but-for and proximate cause.

## I. Material disputed facts as to punitive damages render summary judgment improper.

When the full record is viewed in the light most favorable to E.P., it shows that there are material disputed facts as to punitive damages.

To start, "the TVPRA authorizes punitive damages." *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 206 (5th Cir. 2017). "Every Court of Appeals to address this issue" has agreed. *Moore v. Rubin*, 724 F. Supp. 3d 93, 106 (E.D.N.Y. 2024), aff'd, 160 F.4th 271 (2d Cir. 2025) (citing *Warfaa v. Ali*, 1 F.4th 289, 293-96 (4th Cir. 2021); *Adhikari*, 845 F.3d at 206; *Francisco v.*

*Susano*, 525 Fed. Appx. 828, 834 (10th Cir. 2013); *Ditullio v. Boehm*, 662 F.3d 1091, 1096-1102 (9th Cir. 2011)). The district courts agree. *See e.g., W.K. v. Red Roof Inns, Inc.*, No. 1:20-CV-05263-VMC, 2024 WL 2892322, at *2 (N.D. Ga. June 10, 2024); *see also J.G. v. Northbrook Industries, Inc.*, No. 1:20-CV-5233-SEG, 2025 WL 1899683 at *3 (N.D. Ga. July 9, 2025). Thus, E.P. is permitted to recover punitive damages under the TVPRA.

Defendants' argument that punitive damages are "inappropriate here" ignores the record and the law. Mot. at 20. The Supreme Court has recognized that "punitive damages in tort cases may be awarded not only for actual intent to injure or evil motive, but also for recklessness, serious indifference to or disregard for the rights of others, or even gross negligence." *Smith v. Wade*, 461 U.S. 30, 48 (1983); *see also J.G.,* 2025 WL 1899683 at *3 (citing to *Smith*). Notably, the Fifth Circuit's Pattern Jury Instruction (Civil Cases) instructs jurors to award punitive damages if the Defendants, "acted with malice or reckless indifference to the rights of others when one's conduct, under the circumstances, manifests a complete lack of concern for the rights or safety of another." § 15.7 (emphasis added).

Here, there is extensive evidence of Defendants' reckless indifference in its operation of the property and its dealings with E.P. and her traffickers. Even though the hotel had a "problem" with commercial sex crimes (Ex. 3 at 91:16-20, 17:15-25), the staff were overwhelmed with the volume of crime and could not keep up with it, (Ex. 3 at 143:19-22, 142:5-11, 141:15-19, 34:11-16), and the hotel did not have enough security, (*id.* at 62:21, 102:16-21, 21:5-22:8), Defendants still refused G.M. Primm's repeated requests for more security, (i*d.* at 21:15-17, 110:19-24; Ex. 2 at 85:10-14, 88:20-25, 92:12-93:18, 99:11-21, Ex. 5 at 118:1-18).[22] Knowing that minors are being

[22] With Defendants refusing to authorize the needed security, G.M. Primm moved off-property in violation of her employment rules because of safety concerns, (Ex. 3 at 18:4-13; Ex. 2 at 181:3-25, 184:11-1),

sold for sex at a hotel and doing nothing in response is the definition of reckless indifference. So is operating a hotel with a known commercial sex crimes problem where staff routinely violate security rules (*Id.* at 73:13-74:3, 74:18-2, 64:2-7, 84:6-8) and assist criminal actors on the property (Ex. 8 at ¶¶ 8, 9). These conditions and practices directly facilitated E.P.'s exploitation at the hotel—the staff directly aided her traffickers, rented her (a minor) a room and gave her room keys regularly without ID, changed out her towels multiple times a day, and saw her loitering in provocative clothing in common areas with her traffickers to attract at least five sex buyers per day. Much of this conduct continued after staff received notice that E.P. was a runaway child. These facts, in total, create a jury question as to reckless indifference.

Moreover, on this record, a reasonable jury could find that Defendants are liable for punitive damages under vicarious liability principles based on the reckless indifference of their managers and employees at Tucker Motel 6. Based on the foregoing evidence, there is at least a question of fact at this stage whether, under *Kolstad*, Defendants "authorized the doing and the manner of the act," whether "the agent was unfit and the principal was reckless in employing him," whether "the agent was employed in a managerial capacity and was acting in the scope of employment," and whether "the principal or a managerial agent of the principal ratified or approved the act." Mot. at 21 (quoting *Kolstad*). If *any* of those conditions are met, then vicarious liability attaches, and there is record evidence to support *each* of them, as set forth herein.[23]

---

[23] For example, there is a fact question as to whether Defendants "authorized the doing and manner" of renting and giving out room keys to E.P. (a child) without ID when that routinely happened at Tucker Motel 6, the system regularly did not have ID or guest information stored, and the electronic system itself did not require ID information to be entered. Likewise, there is a fact question whether agents who "half-report[ed]" things and routinely did not follow rules, or the G.M. who did not live on property despite the job requirements, were "unfit" and Defendants were "reckless in employing" them. There is also a fact question whether "the agent[s]" who rented rooms to E.P.'s traffickers and rented a room and gave keys to E.P. were "acting in the scope of

FILED UNDER SEAL

Therefore, contrary to Defendants' argument, the TVPRA permits punitive damages, and E.P. has presented substantial record evidence that creates at least a jury question regarding whether Defendants are liable for punitive damages.

**CONCLUSION**

For the foregoing reasons, E.P. respectfully requests that the Court deny Defendants' Motion in its entirety.

---

employment." And whether "the principal or a managerial agent of the principal ratified or approved" renting rooms without ID, giving out room keys without ID, and so on.

Respectfully submitted this 21st day of May 2026.


*/s/ David H. Bouchard*
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859
Oto U. Ekpo
oto@finchmccranie.com
Georgia Bar No. 327088

FINCH McCRANIE, LLP
229 Peachtree Street NE
Suite 2500
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

Ron Estefan
ron@ronestefanlaw.com
Texas Bar No. 00785851

THE ESTEFAN FIRM, P.C.
2306 Mason St.
Houston, TX 77006
(713) 333-1100 - Telephone

Patrick J. McDonough
pmcdonough@atclawfirm.com
Georgia Bar No. 489855
Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999
Jennifer M. Webster
jwebster@atclawfirm.com
Georgia Bar No. 760381

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard
Suite 4000
Duluth, Georgia 30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile

*Attorneys for Plaintiff*

FILED UNDER SEAL

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2026, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system. The foregoing will be served on all counsel of record via email the same day.

*/s/ David H. Bouchard*
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859

FINCH McCRANIE, LLP
229 Peachtree Street NE
Suite 2500
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

*Attorney for Plaintiff*

**CERTIFICATE OF SEALING MOTION**

Pursuant to Local Rule CV-5(a)(7), I hereby certify a motion to seal the unredacted version of Plaintiff's Response in Opposition to G6 Defendants' Motion for Summary Judgment as to Causation and Punitive Damages has been filed.

*/s/ David H. Bouchard*
David H. Bouchard